IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION


In re:

North Bay Village, LLC          Case No.:
                            9:10-bk-03090-ALP
         Debtor.         Chapter 11 case


VIDEO CONFERENCE DEPOSITION OF

RICHARD B. GAUDET


Thursday, November 11, 2010

11:37 a.m.



Suite 1100
171 17th Street Peachtree Street
Atlanta, Georgia


Renda K. Cornick, RPR, CCR-B-909

# TABLE OF CONTENTS

| Exhibit | Description | Page |
|---------|-------------|------|
| 1 | Third Amended Disclosure Statement | 5 |
| 2 | Second Amended Plan of Reorganization | 5 |
| 3 | Objection to Second Amended Plan of Reorganization | 5 |
| 4 | Monthly Operating Report February 2010 | 5 |
| 5 | Monthly Operating Report March 2010 | 5 |
| 6 | Monthly Operating Report April 2010 | 5 |
| 7 | Monthly Operating Report May 2010 | 5 |
| 8 | Monthly Operating Report June 2010 | 5 |
| 9 | Monthly Operating Report July 2010 | 5 |
| 10 | Monthly Operating Report August 2010 | 5 |
| 11 | Monthly Operating Report September 2010 | 5 |
| 12 | CV | 9 |
| 12A | Testimony | 12 |
| 13 | Promissory Note | 50 |
| 14 | CoStar Retail Report Midyear 2010 | 57 |
| 15 | Operating Statement | 60 |
| 15A | Future Operating Budget | 79 |

1

TABLE OF CONTENTS

2

Exhibit        Description                          Page

3

16       Property Solutions

4                Property Condition Assessment        65

5       17       CWCapital Report November 27, 2010   67

6       18       CWCapital Report August 21, 2009     67

7

8
      (Original exhibits enumerated above have been
attached to the original transcript.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APPEARANCES OF COUNSEL


On behalf of the CWCapital:

    JACQUELINE FERRIS, Esq. (Via teleconference)
    Burr & Forman, LLP
    Suite 200
    450 South Orange Avenue
    Orlando, Florida 32801-3385


On behalf of North Bay Villages:

    STEVEN BERMAN, Esq. (Via teleconference)
    Shumaker, Loop & Kendrick
    Suite 2800
    101 East Kennedy Boulevard
    Tampa, Florida 33602

Also Present:

    Debbie Jackson



                                  - - -

1    (Reporter disclosure made pursuant to
2    Article 10.B of the Rules and Regulations of the
3    Board of Court Reporting of the Judicial Council
4    of Georgia.)
5    (Exhibits 1 through 11 were marked for
6    identification.)
7    RICHARD B. GAUDET,
8    having been first duly sworn, was examined and
9    testified as follows:
10   CROSS-EXAMINATION
11   BY MR. BERMAN:
12   **Q.     Would you please state and spell your name**
13   **for the record.**
14   A.     Richard Gaudet, G-a-u-d-e-t.
15   **Q.     Mr. Gaudet, my name is Steve Berman.  I**
16   **represent North Bay Village, L.L.C., in its Chapter 11**
17   **bankruptcy case.  I am going to have a series of**
18   **questions for you today.  If at any point in time I**
19   **ask you a question that you don't understand or you**
20   **are not sure what I might be getting at, please stop**
21   **me and ask me to restate my question so that you**
22   **understand it completely.  If you don't ask me to**
23   **restate or explain my question, I am going to assume**
24   **you understand it.  Is that fair?**
25   A.     Yep.

Q.      If at any point in time you want to take a
break, just let me know you want to take a break.  We
will do that.  The only thing I ask is that you let me
get any answer to any pending questions that may have
already been asked so we won't take any breaks while
questions are pending.  I may want to finish up a
logical area of questioning before we take that break.
But if you need a break, just let me know, okay?

A.      Okay.

Q.      And since we are all sort of participating
in three different cities, geographically and
telephonically, and because the court reporter will be
taking everything down stenographically, I will ask
that you give audible answers to questions that I will
ask today.  The court reporter won't be able to take
nonverbal responses from you like a shrug of the
shoulders or nod of the head, okay?

A.      Yes.

Q.      Mr. Gaudet, by whom are you presently
employed?

A.      GlassRatner Capital and Advisory Group.

Q.      Capital advisory group?

A.      Capital and Advisory Group, L.L.C.

Q.      And which GlassRatner office are you
resident in?

A.    Atlanta.

Q.    **What is your position there?**

A.    Principal.

Q.    **Does that mean you are a shareholder?**

A.    Yes.

Q.    **How long have you been at GlassRatner?**

A.    Since 2004, I think September 2004.

Q.    **By whom were you employed prior to GlassRatner?**

A.    It was Wachovia, formerly First Union.

Q.    **What was your position with Wachovia?**

A.    I was the regional manager of special assets.

Q.    **How long were you with Wachovia or First Union?**

A.    Through its acquisitions and predecessors since June of 1991.

Q.    **And prior to June of '91, by whom were you employed?**

A.    I was with the United States Army briefly from 1999 until -- I am sorry, 1989 till '91.  Prior to that, I was employed by Hibernia National Bank and a series of predecessors.

Q.    **Can you briefly describe for me your educational background.**

A.    I attended Louisiana State University.
Did not complete an undergraduate.  I have attended
various training and military training courses.  And
then various banking, RMA credit analysis, RMA Omega
underwriting, various RMA and AIB courses.

**Q.    Which university did you attend?**

A.    Louisiana State University.

**Q.    I am sorry.  I am having a hard time
hearing your answer.**

A.    Louisiana State University.

**Q.    Okay.  Great.**

**What years were you there?**

A.    I was there from '78 till '82.

**Q.    Do you hold any licenses other than a
driver's license?**

A.    I have a pilot's license.

**Q.    Any professional licenses?**

A.    No.

**Q.    How about any certifications from your
banking training?**

A.    No.

**Q.    Can you describe for me the type of work
you did at GlassRatner?**

A.    I am primarily engaged in the financial
restructuring area, although I occasionally work in

the receivership fiduciary practice in the financial

restructuring.  I do troubled company, troubled debt

restructuring, most recently primarily in the real

estate industry, but historically in C&I, commercial

and industrial, as well as real estate.

**Q.     Have you ever testified in court?**

A.     I have.

**Q.     Have you ever testified in Bankruptcy Court?**

A.     I have.

**Q.     Can you describe for me your bankruptcy testimony experiences over the last three years.**

A.     Are we talking in court?  Do we have my CV

handy?

(Exhibit 12 was marked for

identification.)

**Q.     (By Mr. Berman)  We can mark your CV as Exhibit 12.**

A.     I don't have it.  I testified most

recently I think in 2008 in the Vallambrosa case in

Savannah.  There are several pending cases in State

Court as well as Bankruptcy Court where we have not

actually given testimony outside of deposition.  I

have testified not as an expert witness but as a fact

witness on the Adventure Parks matter which was in

Bankruptcy Court.  That was not in the past year.  I
guess that would have been 2008 also, maybe late --
early 2009 in which I am the liquidating trustee.

    **Q.**    **What was the name of the Savannah case you testified?**

    A.    Vallambrosa Holdings.

    **Q.**    **On what issue did you testify?**

    A.    Plan feasibility.

    **Q.**    **For what constituency did you testify on that case in Savannah?**

    A.    That was on behalf of the secured
creditor.

    **Q.**    **So other than your testimony as an expert witness in the Savannah case and your testimony as a lay witness in the Adventure Parks case, have you provided any other expert testimony in Bankruptcy Court in the last three years?**

    A.    When you say in court, are you saying on
the stand in court --

    **Q.**    **Have you provided an expert report that has been received by the Bankruptcy Court as an expert witness, whether in court or as a stipulation?**

    A.    I don't believe in Bankruptcy Court, no.

    **Q.**    **How about going back another two years, going back a full five years?**

A.    I have provided, if we go back to my time at First Union, I testified frequently as a, again, as a fact witness, as a creditor in Bankruptcy Court.

**Q.    But that was not as an expert witness, just as a fact witness.**

A.    That's correct.

**Q.    We have marked your CV as Exhibit 12, hopefully.  Do you have a paper copy of that in front of you?**

A.    No, we do not.

MR. BERMAN:  Off the record.

(A discussion off the record.)

THE WITNESS:  There are actually six additional cases recently added, none of which have required testimony yet that are not on this version.  One representing --

**Q.    (By Mr. Berman)  Let's step back a second. Let's go back on the record.  Let's mark this CV as Exhibit 12.**

A.    Okay.

**Q.    Mr. Gaudet, will you look at Exhibit 12 and tell me if you recognize it.**

A.    I do.

**Q.    Is Exhibit 12 your current curriculum vitae?**

A.    It is the most current prepared version. There are additions since the date of this one.

Q.    **There is a single page document called Richard Gaudet, Testimony Experience.  Why don't we mark that as Exhibit 12A.**

A.    We marked that as Exhibit 12 already.  Are you referring to a different document?

Q.    **Well, I have two documents.  One is marked Gaudet Curriculum Vitae and one is marked Gaudet Testimony January 2010 so I want to mark your exhibit testimony experience as 12A.**

A.    You wanted the CV marked as 12.

(Exhibit 12A was marked for identification.)

Q.    **(By Mr. Berman)  Is Exhibit 12A a listing of your expert testimony experience?**

A.    Yes, it is.

Q.    **So 12A includes looks like three times you have testified as an expert witness, two in State Court and one in the Savannah Bankruptcy Court; is that correct?**

A.    Yes.

Q.    **And you have not testified in open court as an expert witness any time other than these three times?**

A.     Well, you will note two of those are not in open court.  Two of these are by deposition, still pending trial, the Osborne matter and Chatham matter.

**Q.     The only time you testified in open court was Vallambrosa Holdings matter in Savannah; is that correct?**

A.     As an expert witness, that's correct.

**Q.     But in the other two you have given deposition testimony in matters not yet gone to trial.**

A.     I have.

**Q.     Then you were starting to tell me before we marked these exhibits that you have five other retentions where you have been retained as an expert.**

A.     Yes.  Four are affiliated with -- they are, I guess, derivative lawsuits, I guess, affiliated with the Osborne matter listed on the top of the page.  The fifth one is expert witness on behalf of a neighborhood community bank or FDIC v. Neighborhood Community Bank on a D&O claim.

**Q.     Well, let's take them one at a time.  You are saying in addition to Exhibit 12A you have five other retentions as an expert witness in addition to what is on 12A.**

A.     That's correct.

**Q.     So why don't you walk me through them.**

**You told me the first one was you were going to**

**provide expert testimony in a D&O matter for the FDIC.**

     A.     This is on behalf of actually a law firm

that was representing a community bank that was

subsequently shut down.  The FDIC is bringing an

action against the law firm under its D&O claim.  So I

am testifying on behalf of the law firm.

     Q.     **And who is the law firm who is the subject**

**of that lawsuit?**

     A.     I don't have that with me.  I frankly

don't recall.

     Q.     **In what city is that case pending?**

     A.     It is being -- as far as I know it has not

been filed yet.  It is strictly preparatory at this

stage.  But it would probably be in federal court.

     Q.     **What is the second of the five additional**

**retentions?**

     A.     The other four are all related.  They are

derivative actions related to the Osborne matter.

     Q.     **Will those be in Chatham County, Georgia,**

**State Court?**

     A.     That's correct.  And I shouldn't say

derivative as much as probably copycat type suits.

These are homeowner or condo owner claims against a

developer and a bank.

**Q.    Can you describe for me the type of testimony that you are giving in the Osborne matter as well as these other what you call copycat claims?**

A.    All of those are related to typical and usual banking practices as far as what constitutes a commitment on the part of a bank.

**Q.    Let's go back to Exhibit 12A.  The Osborne matter.  You have explained to me that Osborne is also typical and usual banking practices, right?**

A.    That's correct.

**Q.    As well as those additional four that are going to be filed in State Court.  You explained that the FDIC matter is where a law firm has retained you, you are looking at D&O type claims against the law firm.**

A.    Yes.  It relates to a real estate closing conducted by the law firm on behalf of the bank, representing the bank.

**Q.    So you are going to provide testimony about what is reasonable and customary for law firms to do in real estate closings?**

A.    No.  I am providing testimony in mitigation, i.e., that the loans -- whatever affect the lawyer's actions may have had would have been greatly mitigated had the original loans been in

accordance with the bank's policies and procedures.

Q.    **Okay.  So lending-related work in that FDIC matter.**

A.    Correct.  Underwriting policies and procedures relating to commercial real estate lending.

Q.    **When you say underwriting, you mean loan underwriting?**

A.    Correct.

Q.    **And remind me again of the substance of your Vallambrosa Holdings testimony.**

A.    Vallambrosa was a proposed acquisition development loan for the development of high-end residential real estate.  We provided testimony as to the feasibility of their plan which called for the development and build out and sell out of the real estate.

Q.    **And when you say the plan, is that a Chapter 11 plan or is it some other business plan?**

A.    Chapter 11 plan.

Q.    **You represented the bank?**

A.    I represented the senior lender.

Q.    **Senior lender who was going to provide exit financing or the senior lender who was already a secured creditor when the case was filed?**

A.    The secured creditor in the case.  It was

a non-bank lender.

    **Q.    So your client in the Vallambrosa case wasn't proposing to make a loan to the debtor in possession?**

    A.    I think he made all the loans he desired to make to that debtor.

    **Q.    Understood.  And were you accepted as an expert in that case?**

    A.    I was.

    **Q.    Were there any challenges raised by the debtor's counsel?**

    A.    Not to my recollection.

    **Q.    Was the case confirmed?**

    A.    No, it was not.  Well, let me qualify that.  The plan was not approved.  I don't know whatever happened to the case.  I didn't follow it beyond that.

    **Q.    And in the Chatham Investment group case, what was the substance of your testimony given in State Court, Fulton County?**

    A.    Chatham Investment is a lawsuit between two lenders that essentially alleges one lender is trying to get another lender to reimburse them because of the -- the lender who was taken out allegedly misled the takeout lender as far as facts around a

given loan.  They made a loan presumably relying on information that later turned out to be incorrect. Again, that testimony is more related to conventional banking practices and procedures.

**Q.    Have you ever worked as an accountant?**

A.    I have done a significant amount of accounting work.  I have never worked -- when you say accountant, why don't you explain what you mean by that.  Because that has a certain connotation to me.

**Q.    Have you ever held the title accountant or bookkeeper in any business?**

A.    No.

**Q.    Have you ever acted as an auditor?**

A.    Have I ever held the title of auditor or have I acted as an auditor?

**Q.    Have you ever acted as an auditor, performed auditing functions?**

A.    Yes, I have.

**Q.    In what circumstances?**

A.    We have a fairly large forensic accounting practice and I have occasionally worked on projects in those matters in that practice.  I have also acted as an assignee in the assignment for the benefit of creditors which requires a certain amount of audit work prior to the execution of the assignment.  I have

acted as chief restructuring officer of two different

companies in which we were required to go in and audit

prior management's accounting to verify the quality

and accuracy of financial statements.

**Q.     Okay.  When you said you have done**

**accounting work even though you have not been an**

**accountant or bookkeeper, what accounting work have**

**you done?**

A.     In a turnaround practice, accounting is

obviously a key component of that.  So in any

turnaround engagement there is a significant

accounting component that involves review of general

ledger, review of operating procedures, costing

procedures in a manufacturing company, I mean, the

entire gamut of accounting in the running of a

commercial business.

Now, have I set up and operated, paid

accounts payable, I have supervised that in my

capacity as restructuring officer.  I have never been

the accountant who wrote the checks.  I signed the

checks.

MR. BERMAN:  Let's go off the record.

(Recess from 11:59 a.m. to 12:04 p.m.)

**Q.     (By Mr. Berman)  Back on the record.**

**Mr. Gaudet, when is the first time you**

heard the name North Bay Village?

        A.      I guess it would have been in early to mid
August.  I don't know exactly, but it was probably
sometime in August.

        **Q.      Can you describe for me the circumstances
under which you heard that name?**

        A.      I received a call from Ms. Dell-Powell
asking if we could provide expert witness testimony on
a matter in Fort Myers.  I happened to have been
spending a lot of time in that area at that time.  We
discussed it briefly.  She told me she would get back
to me and then a month or so later we executed an
engagement letter.

        **Q.      So you did an engagement letter.  What was
the date of your engagement letter?**

        A.      I don't have that with me.  I can look it
up if you want to take another break.  I have it on
the computer here.

        **Q.      I would actually like to get a copy of it.
If we can get a copy e-mailed to us, I can ask you
questions about it after we get a copy.**

                MS. FERRIS:  Do you want to take a short
        break and let me get a copy sent by e-mail?

                MR. BERMAN:  That's fine.  We are off the
        record.

```
 1                    (Discussion off the record.)
 2              MS. FERRIS:  We can go back on.
 3         Q.    (By Mr. Berman)  Mr. Gaudet, do you
 4    remember the month in which you were formally engaged
 5    in this case?
 6         A.    I don't remember specifically.  We can get
 7    that when we get the engagement letter.
 8         Q.    Either August or September?
 9         A.    Yes.
10         Q.    Can you describe for me the scope of your
11    engagement?
12         A.    To provide testimony as to plan
13    feasibility.
14         Q.    And what are the terms of your
15    compensation?  Do you get paid on an hourly basis?
16         A.    That's correct.
17         Q.    What is your hourly rate?
18         A.    Right now it is four fifty.  I am not sure
19    what it is on that engagement.  Recently it was -- in
20    the past year it has gone up twice so I am not sure at
21    that point where it was.  Probably at 400.
22         Q.    What were you told about the case?
23         A.    I wasn't told anything.  I eventually got
24    copies of the original plan along with -- the
25    information has kind of been scattered and come in
```

inconsistently but originally got the plan and
disclosure statement from back in May.  We got one
operating report and got copies of the loan documents.
Subsequent to that, we got additional information.
But our knowledge of the case has been strictly from
information provided primarily by what was available
on the Bankruptcy Court filings.

     **Q.**     **So other than the original plan and
disclosure statement, one operating report, and the
loan documents, have you received any other documents
to review?**

     A.     Yes.  We have gotten since then -- you
want me to go through everything we looked at?

     **Q.**     **Yeah.  Please.**

     A.     We have the appraisal that was done on
behalf of the lender CWCapital.  We have loan
documents.  We have --

     **Q.**     **Let me stop you a second.  What is the
date of the appraisal?  And is that the $10 million
appraisal?**

     A.     This appraisal is dated June 14th, 2010,
with an effective date of May 28th, 2010, for the
as-is market value.

     **Q.**     **That's the $10 million valuation?**

     A.     That's correct.

Q.      **Okay.**

A.      I have copies of the loan documents which include a series of promissory notes which were rolled up through subsequent consolidation and modifications.

I have got the debtor's monthly operating reports for the periods February 12th through 28th through September 1st through September 30th.  Got the seconded amended disclosure statement.  The debtor's supplemental motion to value collateral.  Copy of the co-tenancy and operating agreement.  A 2009 property condition report.  Also in here which wasn't provided from the court or from counsel was I got a copy of the CoStar retail report and survey of emerging market conditions, both for market conditions for the Florida market and the CoStar report for the southwest Florida market.

Additional information which was recently obtained is a copy of the master lease agreement, copies of tenant leases, and copy of the easement.  Also recently attained that -- that easement includes the condominium declaration documents.

Got 2006, '7, '8 and '9 financial statements.  Some guarantor financial statements.  Rent rolls.  Payment activity ledger reports from the lender.  Pro forma for 2010 and then the borrower's

appraisal dated May 20th, 2010.

Q.    The appraisal you have, the May 20 appraisal?

A.    Yes, sir.

Q.    Who performed that appraisal?

A.    That was done by Armalavage & Associates, Inc.

Q.    Armalavage?

A.    Armalavage & Associates, yes.

Q.    Understanding that you received current pro formas today, when did you receive the other documents?  When was the last time you got the other documents, or the last date by which you received the other documents you just detailed for me?

A.    I received them over the past -- the bulk of them in the past 30 days.  The things I covered in the first binder I had prior to the first hearing which was October 6th, I believe.  Since October 6th, I have received the balance of these documents.

Q.    Have you prepared a report?

A.    I have not.

Q.    Can you explain for me what your scope of engagement has caused you to do.  What are you trying to accomplish with respect to your retention?

A.    What we typically -- the way we approach a

feasibility engagement is -- we didn't get into this in my experience, but the vast majority of my experience for the past five years has been working on the debtor's side, where we consistently do plans, either in bankruptcy or out of bankruptcy for the restructure of debt.  So we approach this the same way we would if they were restructuring the debt on behalf of the borrower.  To do that, it has to meet certain requirements outside of bankruptcy as well as in bankruptcy.  It has to be financially viable.  It has to be something that is reasonably acceptable to a bank given that bank's situation and condition and likewise in the case of Bankruptcy Court it has to be something to meet the requirements for plan confirmation in Bankruptcy Court.

So we start off as a straight underwriting project.  If at all possible we attempt to inspect the property; gather information such as historic and current operating information, rent rolls, leases. All of these things to basically underwrite a loan. From that we determine based on the income of the property, the current NOI and expected NOI, can it service the debt and under what terms can it service the debt.  Then we would look at are those terms financially feasible, are they reasonable, can we

expect a lender to loan us money under those terms.
If all of those things come together, we would prepare
a proposal along with supporting documentation to
present to the lender.

So in the case of the feasibility, looking
at it from the -- in the bankruptcy scenario where the
plan is done outside, we would look at it from the
perspective of a lender.  Has it been properly
underwritten, is the request reasonable in market
terms and does it hit the requirements for bankruptcy
plan confirmation.

**Q.      In this case, what were you trying to
accomplish?**

A.      Well, it has been a bit of a moving
target.  Every time we started down a path, the plan
either changed or the budget changed.  At this stage
what we are trying to accomplish is we have basically
taken at face value the cash flows.  We haven't gone
in and audited, conducted any sort of forensic
investigation on the cash flows.  We have accepted to
a large extent the appraisal value, you know, mainly
because there is already a stipulation as to value.
So we have gone in and looked at the proposal terms,
can the property perform under these terms.

**Q.      And you said, you mentioned earlier that**

**part of this traditional analysis is you looked to see**

**if the property can service the debt.  What is the**

**debt in this case in your understanding?**

A.    The debt is, I believe, 23, roughly 23-1/2

million.  The claim taking into account all fees,

interest and so forth, I believe is north of 29

million.

Q.    **What is the debt that you looked at to**

**determine that would need to be serviced in this case?**

A.    Well, I looked at it several different

ways.  I looked at it from a perspective of an 1111(b)

claim where you are trying to get the full debt paid.

I have looked at it from the perspective -- which I

think the latest plan proposed is an 1124, extend the

debt.  Then I have taken the far extreme which is if

you take the most recent plan as I interpret it is

that we are going to essentially back into the debt.

So we are going to figure out what the debt service is

and then back into a number and call that the debt.

So depending on what you want to call the debt, I have

got different answers.

Q.    **Let's take each of your three**

**methodologies one at a time.  The 1111(b) issue.**

**First of all, what is 1111(b) to you?**

A.    It is an election a lender makes whereby

they -- nonrecourse lender, they waive the right to unsecured claim in the case in exchange for a commitment under the plan that ensures they will be paid in full their principal balance.

**Q.    I am sorry, I am having trouble hearing you.  Can you maybe move the microphone closer to you.**

A.    Unfortunately, it is attached to the table.

**Q.    If you can give me your answer again.  You told me 1111(b) election is an election a lender makes to waive the right to unsecured claim.  I missed the rest.**

A.    The lender in lieu of an unsecured claim would elect to make an entirely secured claim provided the plan provides for full payment of that claim.

**Q.    How does that work in your understanding?**

A.    How does what work, the election?

**Q.    Yes.**

A.    The creditor has the option of making the election or not making the election.

**Q.    Okay.  And how would under an 1111(b) election the full secured claim be typically paid out in a plan?  Do you understand that how works?**

A.    The net present value of future payments has to be greater than or equal to the value of the

claim.

Q.    **Over what period of time?**

A.    I don't know that there is a restriction
on the period of time, hence the reason for the net
present value calculation which takes into account the
value of time.

Q.    **Is it done over 20 years, 30 years, 50
years, 70 years?**

A.    I don't know.  I mean, I think it has to
be done within the plan confines, but it depends on
the plan.  The ones I have worked on have always
provided for five years or less.

Q.    **And under an 1111(b) analysis, how did you
assess the facts of this case and what facts did you
rely upon?**

A.    I don't think there is -- there are
several different sets of facts.  So depending on
which set of facts you want to use, if we are going to
assume that your plan will assume the existing debt
and resume making payments at 141,000 a month from now
through 2016, it comes up short.  If we are going to
assume that we reamortize the debt on a 30-year AM on
a notional principal balance of 10 million 2, it comes
up grossly short.  Under any analysis I have done we
do not meet an 1111(b) test.

Q.    Well, let's take it one step at a time.
You said if we assume the payments are $141,000 a
month, you come up short.  Where did you get the
$141,000 a month?

A.    That's the payment amount stated in the
note.

Q.    Let's go ahead and take a look at the
note.

MS. FERRIS:  Can we take a short break.  I
don't have it as an exhibit.

MR. BERMAN:  It is an exhibit.  It is
tab --

MS. FERRIS:  If we can go off the record
for a second.

MR. BERMAN:  As long as you are not going
to talk to the witness, that fine.

MS. FERRIS:  You can see the witness on
the camera.

MR. BERMAN:  That's fine.  I am asking you
not to talk to the witness.  We can take whatever
break you want.

MS. FERRIS:  That's fine.  Thank you.

(Recess from 12:23 p.m. to 12:28 p.m.)

Q.    (By Mr. Berman)  Mr. Gaudet, can you take
a look at the promissory note entitled --

A.    I didn't hear the last part of that.
Entitled what?

Q.    **Because I haven't given it to you.  It is**
**entitled Consolidated Renewal Promissory Note, dated**
**September 14, 2006, in the amount of $23-1/2 million.**

A.    Yes.

Q.    **Do you see that?**

A.    That's correct.  I have it.

Q.    **Let me turn your attention to Section**
**2.04.**

A.    Okay.

Q.    **See that provision?**

A.    Yep.

Q.    **Have you ever read that provision?**

A.    I have.

Q.    **Did you read the whole promissory note?**

A.    I didn't read the boilerplate, but I read
the -- I guess everything back to the general
conditions.

Q.    **How did you know to read this provision as**
**opposed to any of the other provisions?**

A.    I read the entire note up to that, up to
the general conditions.

Q.    **Okay.**

A.    It happened to be prior to Article 3 so it

got read.

Q.      If you follow along with the language in Section 2.04(a), the first word is borrower, borrower shall be liable.  Do you know who the borrower is?

A.      According to the promissory note, it is North Bay Village, L.L.C., CKS Investment Company, LLP.

Q.      Okay.  And then it says borrower shall be liable upon the indebtedness.  Do you know what the indebtedness is?

MS. FERRIS:  Objection to the extent it calls for a legal conclusion.

Q.      (By Mr. Berman)  You can answer.

A.      Indebtedness is not a defined term under the note.  I would assume the indebtedness is the indebtedness evidenced by the note of twenty-three five.

Q.      Then the note goes on to say, Borrower shall be liable upon the indebtedness evidenced hereby and for the other obligations arising under the loan documents to the full extent but only to the extent of the collateral.  Do you know what the collateral is?

MS. FERRIS:  Objection to the extent it calls for a legal conclusion.

THE WITNESS:  Collateral is a defined

term.  Would you like me to look it up?

Q.    (By Mr. Berman)  Yeah.  Tell me what your understanding of collateral is as you read this note.

A.    Do you happen to know if the definition is in this note or in the mortgage?

Q.    I believe it is described in Paragraph 1.06 of the note.  But you can look through whatever provisions of the note you would like to.

A.    You are correct.  You want me to read 1.06 to determine all the --

Q.    No.  I want to know your working understanding of what collateral is as we read through Paragraph 2.04 together.

A.    Again, my working understanding when there is a capitalized term in the document is going to be whatever the document defines it as.  So I would say it is all security property together with any other security that may be pledged or otherwise granted to lender under loan documents will be referred to as collateral.

Q.    Thank you.  And in lay terms, what is the collateral as you understand it?

MS. FERRIS:  Objection to the extent it calls for a legal conclusion.

THE WITNESS:  Collateral are all the

collateral documents that all collaterally

pledged to the loan.

Q.     (By Mr. Berman)   What collateral was --

A.     Looks like you have rents, issues, income

and profits, the mortgage on the real estate from the

security property.  So it is the security property,

rents, issues, incoming profits.

Q.     What is the mortgaged property?

MS. FERRIS:  Steve, I am going to object

to each of these based on legal conclusion.  Can

we just agree to have a standing objection at

this point?

MR. BERMAN:  Yeah, that's fine.

I just want to know his working knowledge.

MS. FERRIS:  I understand.  I just don't

want to interrupt you on a constant basis.

MR. BERMAN:  I appreciate that.  You can

have the standing objection.

Q.     (By Mr. Berman)   What is your

understanding, sir, of the mortgaged property?  What

is that?

A.     It is the real estate located at -- let me

get the address for you.  Condominium interest in

North Bay Village, located 26381 South Tamiami Trail,

Bonita Springs, Lee County, Florida.

Q.    In reading through the language of Section 2.04 which indicates that the borrower is liable only to the extent of the collateral, how does that affect your view of what the debt owed on this loan is?

A.    It affects my view that the collection of the debt is limited to the value of the collateral.

Q.    So you were starting to walk me through your 1111(b) analysis.  Your first assumption was that $141,000 monthly payments needed to be made.  You have looked at the financials and you realize that $141,000 monthly payments cannot be made.  Do I understand your position correctly?

A.    That's correct.

Q.    And did you do any other sort of 1111(b)-type analyses other than to conclude that the debtor was unable to pay $141,000 a month?

A.    I can honestly say it was the fastest 1111(b) analysis I have ever done.

Q.    So is the answer no, you haven't looked at any other --

A.    That's correct.  Well, I take that back.

Q.    -- permutations?

A.    I added up other permutations, if you went with the lower payment amount, assuming a resetting of notional value of the debt at some notional appraised

value, then I calculated a grand sum of those payments

even without applying a discount factor because as you

know the argument often comes in the discount factor.

But even without applying any discount, it still

didn't come close to covering the debt.

Q.     **Well, let me ask, help me understand what**

**other analyses you did based upon different values of**

**the property.**

MS. FERRIS:  Can you clarify that

question?  Objection to form.

THE WITNESS:  I am not sure I understand

that.

MR. BERMAN:  The witness testified that he

first was able to conclude that the debtor is

unable to pay $141,000 a month.  He said that was

the quickest 1111(b) analysis he had ever done.

I asked him if he did any other analyses.  He

said he looked at using other valuation numbers

for the property and the debtor wasn't able to

make those payments as well.  I am trying to

understand what other numbers he looked at.

THE WITNESS:  The only other number I used

was from the original plan.  It assigned a

notional value of the debt of $10.2 million.  If

you amortize 10.2 million on a -- I think it was

a 30-year, 6-percent, just back of the envelope,
it came up like $61,000. Even if you ran that
out to 34 years with no discounting whatsoever,
you would never recover your principal balance,
your claim amount.

Q.     **(By Mr. Berman)  Based upon what?**

A.     Well, 61,000 times 360 is $21,960,000 so
that's without any discounting. If cost of capital is
zero, you don't get your principal back.

Q.     **Walk me through the math again.  Let me
grab my calculator.**

A.     Okay. Again. This goes back to --

Q.     **If we are going to use the $10.2 million
valuation, tell me how you run the math.**

A.     Let me run it real quick here. If we go
back to the original plan, it called for a $10.2
million valuation, a 4-percent amortization, sorry,
4-percent interest rate and a 30-year AM. That gives
you a principal and interest payment of $48,534.

Q.     **I am sorry.  48,000?**

A.     Five thirty-four fifty-eight.

Q.     **Okay.**

A.     Multiply that times 360, the number of
payments, you get a total recovery under the plan of
$17,472,448. Now, normally you would apply some

discount factor to that which is associated with the
market rates that you would get on that type of
property.  That step was unnecessary because if you
apply any discount factor, the number goes down from
17.  So even if you assume a zero cost of money, you
can't get your principal back under this plan as
originally proposed.

**Q.     And why did you do that analysis when you used a $10.2 million valuation?**

A.     That was what called for the original
plan.  The original plan had a stipulated value of
$10.2 million, the May 13th plan.

**Q.     I understand you applied a 4-percent interest factor and did a 30-year amortization and got 48-1/2 thousand dollar monthly statements.  I get all that.  I don't understand the next step that you took to multiply 48-1/2 thousand dollars times 360 months.  Why did you do that?**

A.     As a creditor, how much would you collect
under this plan.  If you stacked all your checks up 30
years from now and said, how much money did I get, it
would equal 17,472,000.

**Q.     Okay.  Why did you perform that analysis?**

A.     Well, it is what I call the stupid test.
If you can't pass that one, there is really not a

reason to perform any further analysis.  It saves my
clients a lot of money.

Q.    **But I am trying to understand what reason
you performed that analysis.**

A.    The test being do we -- if we accept it
under 1111(b), we have to recover our claim.

Q.    **Okay.  What is the claim?**

A.    29 million.

Q.    **Okay.**

A.    So back to your question.  If the grand
total of payments before application of discounts is
less than the debt, then you really don't need to do
any further analysis.  You can stop where you are.

Q.    **And your view of the debt is that it is
$29 million.**

A.    My view of the claim or at least the claim
that I have been told exists is roughly 29 million.

Q.    **And did you perform any other analyses?**

A.    In regard to 1111(b)?

Q.    **Yes.**

A.    I may have run different variations of it,
but they essentially all produced the same result.

MS. FERRIS:  Can we clarify as to whether
that is to this plan or to other plans?  You keep
referring to a plan as well.  Is the question

referring to the first plan or all plans?

MR. BERMAN:  I didn't say plan.  I just asked if he performed any -- if the witness performed any other analyses under 1111(b).

MS. FERRIS:  Okay.

THE WITNESS:  And I think that's an important distinction.  We have not done any analysis as to the October 6th modification of the plan because we don't have any idea what the value is that is going to be used to calculate the defined term of net principal.  Again, I don't know that that necessarily applies under 1111(b) anyway.  So we can't calculate the payment.  I think it is safe to say that the payment under the current proposed plan is going to be lower than the one that we used for this initial test and as such it will also fail.

Q.    **(By Mr. Berman)  Why do you think the payment is going to be lower?**

A.    Because the plan contemplates a further reduction in value.  If we do the same math, if you have less principal, you are going to have a lower payment.

Q.    **Where does the plan contemplate a reduction in value?**

1       MS. FERRIS:  Can we clarify which plan,
2   please.
3       MR. BERMAN:  Just using the witness's
4   words, whatever he is talking about.
5       THE WITNESS:  I am referring to your most
6   recently amended plan.  What exhibit is it in
7   your book?
8       MS. FERRIS:  It might be easier to mark
9   them if you don't mind so we know which plans we
10  are talking about.
11      MR. BERMAN:  There are 12 exhibits marked.
12      THE WITNESS:  Exhibit 2.
13      MS. FERRIS:  Steve, if I can just confirm,
14  I am going to have a standing objection
15  throughout the deposition as to legal conclusion.
16  I just really don't want to keep restating it.
17      MR. BERMAN:  That's fine.
18      MS. FERRIS:  Okay.
19      THE WITNESS:  I am sorry.  It is not in
20  the plan.  It is one of the motions to revalue
21  that you filed recently.  You will have to point
22  me to it.  But you reference in there an
23  estimated reduction in value of I want to say 5
24  to 8 or 6 to 8 million dollars.
25      **Q.     (By Mr. Berman)  Okay.  Let me ask you**

about that.  Do you know what the property is worth?

    A.    I do not.

    Q.    **Do you know if it is worth less than the prior $10 million appraisal?**

    A.    I have no way of knowing that.

    Q.    **Your feasibility analysis is all centered around whether or not $29 million is going to be paid back over time; is that correct?**

    A.    No.  No.

    Q.    **No.**

    A.    You asked for my assumption related to 1111(b).

    Q.    **Okay.  What other analyses have you done other than your 1111(b) analysis?**

    A.    The other analysis was does the plan provide for recovery in excess of liquidation value under Chapter 7.

    Q.    **Okay.  Why don't you tell me how you did that.**

    A.    I guess straightforward is what we did was put the -- determine the value of the financing contemplated under the plan.  To back up a moment, going back to your original plan which included the liquidation analysis, I have not seen a subsequent liquidation analysis.  It assumes the property can be

sold for $10.2 million.  So we would get under Chapter
7 immediate payment of $10.2 million, immediate being
once we went through the process.

Under the proposed plan, it required us to
stay in the property to allow the property to recover
in value, but it doesn't pay us the risk associated
with the credit.  By that, the appraisal that --
borrower's appraisal, debtor's appraisal assumes a cap
rate because of the risk of the property.  In fact, he
used an extraordinary cap rate because of the risk of
the property.  So the appraisal clearly contemplates a
high risk factor, yet the plan calls for financing
which has no risk whatsoever for the equity.  It is
100-percent financing, it has a 6.034 or a 4 percent,
depending on which plan you look at some relatively
below-market interest rate, and there is no recourse.
So absent risk, the debt should be discounted at the
discount rate determined by the appraiser who has done
the analysis and determined the risk associated with
the product.

So if we are going to take that risk, then
we either have to price the debt at a higher price, or
we have to charge more for the property.  To make it
simple, the cleanest form is tomorrow morning is
Friday, you can pick up any newspaper and see that you

can buy a new car with 1.9-percent financing at a certain price, or if you opt not to take the financing, you can buy that same car for 4,000, $5,000 less.  It is simple mathematics.

Put another way, given the option of a Chapter 7 and we went forward with a liquidation through a Chapter 7 trustee and we were willing to put this type of 100-percent nonrecourse financing, we would get a larger price for the property.  We would get some premium in excess of the appraised value.  So my position would be that a Chapter 7 -- if we level the playing field, either we take financing out or we leave it in, we have to leave it in in both analyses, either the Chapter 7 with that financing would yield a higher value than what your plan contemplates.

Q.    **It would yield a higher value than the appraised value of the property?**

A.    Yes.  The appraised value is a factor of discount rate.  Discount rate is a factor of whose equity is at risk.  So typically an appraisal is going to assume what is called a band of investment, a blended rate between equity return and cost of funds for a loan.  If we assume this scenario because of the fact there is zero equity, so let's say we have a loan, a 50-percent loan to value where the loan rate

is 10 percent and the investor's rate is 20 percent,
then the all-in yield, if you took the cash flows for
both the investor and the lender is going to be about
15 percent, the blended yield.  In this case there is
no blend because there is no equity.  So we take the
discount rate used by the appraiser, apply it to the
debt, the future value of the payments using the same
discount rate is equal to the value that the
current -- the current appraised value.

**Q.    Let's start from the beginning.  Assume**
**you use an appraised value of your client's appraiser**
**which was $10 million.  Let's just use that as a round**
**number.  If there is a $10 million appraised value,**
**are you prepared to give testimony about what that**
**property is worth today?**

A.     I am prepared to give testimony -- I am
not going to give testimony as to the value.  I think
everybody has stipulated to the value.  I would give
testimony stating that if we all assume that property
and we all agree that property is worth $10 million,
if I put nonrecourse, 100-percent financing at a level
that currently cash flows and throws off money, I will
sell it for more than $10 million.

**Q.    Okay.  So your testimony relates to what a**
**discount rate ought to be on financing for that**

**property?**

A.      No.  My testimony relates to basically
common sense.  If I have an option, if I can go to
market today and market this property and say whoever
buys this property, we are going to finance 100
percent nonrecourse at 4 percent, 6 percent, whatever
you want, and we accept your cash flows, all right, we
take these and we say this is the cash flow, I am
going to finance this for you nonrecourse, you will
never lose a dime and you are going to start putting
money in your pocket day one, I will get something in
excess of the current cash value of that property.

         If I went to those same buyers and we had
an auction, we said, okay, guys, it is a cash deal,
who will pay me $10 million; somebody is going to
raise their hand.

         And then I say, okay, who will pay me more
if I carry nonrecourse 100-percent financing.  Here is
your cash flows.  You are going to generate after debt
service 33,000 in October -- I don't know if I am
looking at the current one or not.  This may not be
the current one.  Based on this version, you are going
to generate somewhere between 30 and 40 grand a month,
you put it in your pocket, you got no risk.  Who will
pay me more than $10 million.  They will be knocking

me out the door.

Q.     **Have you put this property up for auction?**

A.     I haven't done anything with the property.

Q.     **And you testified earlier that you were retained to provide feasibility testimony.  Did I recall your testimony correctly?**

A.     That's correct.

Q.     **Have you also been retained to provide any other testimony other than feasibility testimony?**

A.     I would have to look.  We generally have a catchall in the engagement letter, but I would have to look at it.

Q.     **Have you been retained to provide liquidation testimony?**

A.     Specifically no.  But again, what I just covered I think goes to feasibility because feasibility takes into account other alternatives.

Q.     **Okay.**

A.     Again, I don't want to sit here and tell you you can sell this property for 10 million, 5 million, or 20 million.  I am telling you that whatever the market value is, if you put 100-percent nonrecourse financing, I can sell it for more.

Q.     **And are you prepared to provide testimony on the status of the financial marketplace, what loans**

are being made for at what rates by what lenders under what circumstances?

A.    I can provide testimony for that.  I don't know that it is necessarily applicable here, but we do quite a bit of that.

Q.    **Have you been engaged to provide any expert testimony on the status of any efficient marketplace with respect to lending?**

A.    The engagement did not specify what they wanted me to testify on.  They asked me to testify as to the feasibility.  Originally I would have contemplated that as part of the engagement, but again, it goes back to the stupid test.  If we don't get to the point that it makes sense to conduct that analysis, it is not prudent to do so.

Q.    **Okay.**

A.    I mean, if we accept that the proposed terms are market, the plan is not feasible.  So why do I need to worry about whether or not they are market or not.

Q.    **If the plan proposes to pay out the value of the property and for argument's sake, let's say it is $10 million, whatever the appraisals come out at, that's proposed to be paid at 6.034 percent which is the contract rate, and it proposes to pay it out of a**

1    30-year amortization, is it your position that the

2    debtor is incapable of making those payments?

3         A.    At $10 million, yes, based on your most

4    recent cash flow.

5         Q.    Tell me what the monthly payments would be

6    on a $10 million loan at 6.034 percent at 30 years'

7    amortization.

8         A.    It is roughly 61,000, but hang on a

9    second.  10 million?

10        Q.    Right.

11        A.    At ten two it was sixty-one -- hold on a

12   second.

13              $59,872.

14              Did you hear me?

15        Q.    Yeah.  What is the number again?

16        A.    $59,872.76.

17              Are you waiting on me?  Is there a

18   question pending?

19        Q.    There is no question pending yet.

20        A.    Okay.

21              Can I get a refill while you are working

22   on that?

23              MR. BERMAN:  Yes, you can.

24              (Recess from 12:57 p.m. to 12:59 p.m.)

25   ///

1          (Exhibit 13 was marked for

2     identification.)

3     **Q.     (By Mr. Berman)  While we were off the**

4     **record, we agreed to go ahead and mark the promissory**

5     **note Mr. Gaudet was talking about as Exhibit 13 and we**

6     **will make a copy at a break on that.**

7          **Mr. Gaudet, going back to your analysis,**

8     **you came up with $59,872.76 monthly obligation and you**

9     **are saying the current financial statements don't**

10    **allow for a payment of that on a monthly basis.  Is**

11    **that your position?**

12    A.     I am not looking at the current financial

13    statements, I was looking at your budget that you

14    forwarded earlier this morning.  Pro forma operating

15    statement is what you have it styled as.

16    **Q.     So based on the pro forma operating**

17    **statement, you don't believe that payments of**

18    **59,872.76 can be made?**

19    A.     Yeah.  I mean, if I look at, let's take

20    November 1, 2011, through October 31, 2012, you have

21    cash available for debt service of 649,000 which

22    assumes the use of the $98,000 beginning cash.

23          Our payment amount was how much again?

24    **Q.     59,872.**

25    A.     Gives you 718,000 in payments; is that

right?  And you have 649 available.

Q.    **You are looking at the second year; is**
**that correct?**

A.    Well, I mean, we can look at any year you
like.

Q.    **Okay.  You didn't take into account any**
**principal paydown, did you?**

A.    Yes.  I did.  Because I am using your cash
available -- I am sorry, no, I did not take into
account -- I used the number you asked me to calculate
on a $10 million payment.

Q.    **You are aware that under the cash**
**collateral order, cash has been accruing and will be**
**available to CWCapital to pay the loan down.**

A.    I am.

Q.    **You walked me through your 1111(b)**
**analysis and you walked me through this valuation and**
**monthly payment analysis.  Did you perform any other**
**analyses?**

A.    No.  I think we would perform, now that we
have the budgets, we would perform a viability of the
business plan versus the proposed terms.  I think the
only piece of that equation we are missing is what is
the notional value of debt that you are trying to
achieve subject to the issues of liquidation analysis,

comparable with liquidation versus a Chapter 11.

Q.    **And you said you had access to the leases; is that correct?**

A.    I do.  I say that, now, I don't know if these leases reflect all the -- any changes or amendments.  I know there is active negotiations taking place, but I have copies of leases.

Q.    **Did you interview any of the tenants?**

A.    I did not.

Q.    **Did you interview any of the management?**

A.    Did not.

Q.    **Did you visit the property?**

A.    I did.

Q.    **When did you visit the property?**

A.    October 5th.

Q.    **Of 2010?**

A.    That's correct.

Q.    **What did you do on your visit?  Let's start, how long were you there for?**

A.    Probably 30 minutes.

Q.    **And what was the purpose of your visit?**

A.    Just easier for me to relate to if I understand the property.  When I am reviewing financials, reviewing appraisals, if I have seen the property it is easier for me to comprehend it.

Q.     And you didn't talk to anyone when you were there?

A.     No.

Q.     So you flew from Atlanta, you did a 30-minute site visit.  Is there any other groundwork you did other than looking at the documents you told me you had access to?

A.     What do you mean by groundwork?

Q.     Well, any market analyses in the area.

A.     Yeah.  I am assisting and advising in the management of a billion dollar real estate portfolio in the southwest Florida market so I am doing groundwork in that market every day.

Q.     What properties did you visit in conjunction with the North Bay Village property?

A.     What do you mean by in conjunction with?

Q.     Did you visit any properties to assist you in developing your opinions as it relates, as they relate to North Bay Village?

A.     I visit properties down there on a regular basis.  I can't tell you that I specifically go look at a property for purposes of comparing it to North Bay Village.

Q.     What properties have you visited in Lee County?

A.     Promenade is one that comes to mind.
There is two projects that my client down there is
working on that are on Tamiami Trail closer in to
Naples, but I can't remember the name of it.

Q.     **I am sorry, I can't hear your testimony.**

A.     There is a couple of projects on Tamiami
Trail that I am working with the lender in doing
restructures and workouts.  There is at least one or
two in Bonita Springs.  It is a billion dollar
portfolio with 700 assets.  We pretty well covered the
market.

Q.     **Can you give me the addresses of the
properties you are working on?**

A.     Not offhand, no.

Q.     **You said there was a property Promenade
that you visited.  Where is that located?**

A.     Promenade is the name of one of them.  It
is on Tamiami.  It is closer to Naples.  There is a
couple of retail deals on Fifth Street in Naples where
all the restaurants are.  There are some retail deals
off of 75, 75, near the Fort Myers Airport
Interchange.  You know, they are interspersed
throughout southwest Florida.

Q.     **And how did your review of those
properties affect your opinion that you rendered**

**today?**

    A.    I don't know that it did.

        MS. FERRIS:  Objection.  Clarify.

        THE WITNESS:  I think I reviewed those
properties in conjunction with what is the best
outcome for this property.  I don't know that
when I go look at one property I necessarily say
this one is better or worse compared to any
others.  Every property has its own
characteristics.

    **Q.    (By Mr. Berman)  What characteristics did
you look at with respect to the other comparison
properties?**

    A.    Well, I look at the same thing I look at
with any property, what is the overall condition of
the property, what is the activity, what is the ease
of access to visibility, the tenant mix, the
construction.  In this case you have three stores.
Obviously in retail that's a drawback.  You are facing
away from the street.  That's a drawback.  Yeah.

        I think the thing that did strike me on
this property that I found unusual was that you got
Robb & Stucky facing Tamiami, the rest facing to the
back.

        The landscaping was generally distressed

in nature.  While the grass was cut, the parking lot
didn't look like it had been swept in a while, either
that or a big storm had come through that day.  Lot of
shrubs were dead or dying up in front of Robb &
Stucky.  Lot of mildew along the backs of the
building.

Unfortunately, the way this thing is
built, you have to drive behind the building to get to
the front of it or along the side of it to get to the
front of it.  I wouldn't say it was a property that
would send me running away, but it was clearly a
property that was in some sort of distress.

**Q.      And the properties that you used as a**
**basis of comparison, you cannot give me any of the**
**addresses for those properties?**

A.      I don't think I said I used any property
as a basis for comparison.  I said I look at a lot of
properties.

**Q.      Okay.  And so you didn't look at any**
**properties to compare them with the North Bay Village**
**property?**

A.      Not specifically for that reason, no.

**Q.      Take a look at tab 3, if you would.**

A.      Of your binder?

**Q.      Yeah.  Please.**

1     A.    The Objection of CWCapital Asset

2   Management to Confirmation of North Bay Village.

3     **Q.    Have you ever seen this document?**

4     A.    I saw it this morning for the first time.

5     **Q.    Have you read it?**

6     A.    Not all of it.  I have gotten about

7   two-thirds of the way through it before we started

8   this deposition.

9     **Q.    Did you have any input in its preparation?**

10    A.    No.  Well, not to my knowledge, anyway.

11    **Q.    And what is the last monthly operating**

12  **report you reviewed in conjunction with your analysis?**

13    A.    I believe it is September 1 through

14  September 30.

15    **Q.    You have a document that was produced to**

16  **us this morning called The CoStar Retail Report for**

17  **Southwest Florida.**

18    A.    Yep.

19     MR. BERMAN:  Let's mark that as Exhibit

20    14.

21     (Exhibit 14 was marked for

22    identification.)

23    **Q.    (By Mr. Berman)  Mr. Gaudet, have you ever**

24  **seen Exhibit 14?**

25    A.    I have.

**Q.** **And what is it?**

**A.** CoStar Retail Report for Southwest Florida
for the midyear 2010.

**Q.** **What is The CoStar Retail Report?**

**A.** CoStar is a firm that basically gathers
data on real estate and submits quarterly reports of
comparable-type information, rental rates, occupancy
trends.

**Q.** **Why did you get this report in conjunction**
**with North Bay Village retention?**

**A.** Initially, I get it in conjunction with a
lot of other things I am doing down there. Initially
I thought that we were going to need it to do
analysis, detail analysis of budget assumptions,
lease-up assumptions. But one, we didn't have those
budget lease-up numbers so I haven't employed the data
in this report yet. Secondly, back to my original
point, the theory employed in this plan really doesn't
facilitate a lot of time spent worrying about the
financial metrics of the deal. It is chasing your
tail around the value of the financing versus the
value of the real estate without financing.

**Q.** **So you have not used any of the data in**
**Exhibit 14 to render your oral statements today.**

**A.** I mean, I literally -- you were here when

I got this.  I really wouldn't have had anything to use it for until just now.

**Q.      Well, what would you use it for?**

A.      To test the feasibility of the assumptions used in the -- sort of the question we asked you, you know, when I first picked this up was the Robb & Stucky lease payments, whatever the Robb & Stucky lease payments, does it make sense.  My quick math -- and I, again, as I mentioned, I only briefly reviewed that lease agreement.  But, you know, the rental rate, the CAM reimbursement, and then the property tax expenses, if we go through and test these numbers, do they look right.  Then to the extent everything looks right on the first pass, you start digging into greater detail, are the assumptions correct.  This is what you would use to test the assumptions.

If they are using, for example, if you look at the notes, second floor rent starting in 2012, it is $9 dollars a foot with $5 CAM, is that valid.  To determine if that is valid I would rely on this type of report.

**Q.      What are the average rental rates for properties similar to the North Bay Village property?**

A.      You are asking me?  I mean, I would have to go through the report and review it.  I don't know.

1    **Q.    Do you have any opinion as to what those**

2    **rates are?**

3          A.    Well, I guess you would have to specify

4    when you say the property.  You have got, within this

5    same property you have got a large, nonconventional

6    retail that is going to have one set of rental rate

7    assumptions, you have got second- and third-story

8    office and retail that is going to have a different

9    set of assumptions.  You have got restaurant space,

10   you have got retail space.  I mean, you are going to

11   have to be more specific, and then we can go in and

12   determine.

13          I relied more so on the values given in

14   the appraisals, both appraisals.  I think they did a

15   good assessment of what the market rates are.

16   **Q.    I will be more specific.  Why don't we**

17   **look at the North Bay Village pro forma operating**

18   **statement.  That's that three-page document.  I don't**

19   **believe we have marked it yet.  So why don't we mark**

20   **that as Exhibit 15.**

21          **(Exhibit 15 was marked for**

22          **identification.)**

23          MS. FERRIS:  Steve, that is the one we got

24          this morning; is that correct?

25          MR. BERMAN:  Yeah.  I am just going to use

it to talk about the retail spaces.

**Q.     (By Mr. Berman)  Look at the income.  Look up at the income part of the pro forma, if you would.**

A.     Okay.

**Q.     And walk me through each one of those tenants and tell me what you believe the rental rate ought to be for those tenants.**

A.     I don't know.  I haven't conducted that analysis.  That would take me some time.

**Q.     Oh, okay.**

A.     I want to clarify.  The form of this pro forma is somewhat nonconventional for the industry.  Whoever prepared this has rolled together base rent, percent rents, CAM reimbursement, property tax reimbursement.  So you get a gross rent number. Typically you would break those out for purposes of calculations.

So in doing this, we would have to go in using the leases and making some assumptions based on the numbers here to conduct that breakout.  One of the things you want to test is -- I don't know what the income increases are throughout this period. Presumably a lot of the income increases are going to be related to increased CAM reimbursement.

Looking at this, I don't know if CAM

reimbursement is increasing to offset expense
reimbursement which the expense levels clearly
project, or is it because there are step ups in the
rent.  So we would have to break this down to a much
more granular level to get any sort of assessment on
it.

     Q.     **Have you conducted any sort of analysis as
to what the appropriate lease rates are for the leases
that you have reviewed?**

     A.     No.

     Q.     **You have not been asked to conduct any
sort of expert analysis of appropriateness of the
lease rates being employed at the North Bay Village
property, have you?**

     A.     I think -- I don't know if you have gotten
the engagement letter yet.  The engagement is to
conduct a feasibility analysis.  Now, again, that is a
step process.  You keep taking steps until you find
the answer.  But there is no reason to keep walking
once you find the answer.  So would that have been --

     Q.     **So the answer is no.**

     A.     Would that eventually be required --
understand, you gave me this two hours ago.  So have I
reviewed any of this, no.

     Q.     **I am sorry, go ahead with your answer.**

A.      I forgot where I was.

Q.      **Are you done with your answer?**

A.      Yeah, I am done.

Q.      **Let's forget about Exhibit 15 for just a minute.  You indicated earlier you have reviewed all the leases.  My question to you is you have not yet compared any of those leases to what you view as market rate for lease amounts, have you?**

A.      I think we can go back and look.  But I don't think I said I reviewed all the leases as much as I said I have all the leases.

Q.      **So you have not read the leases?**

A.      No.  Have I read all the leases, no.  I have the leases.  The comment was more --

Q.      **You have not compared the lease rates -- I am sorry.  Go ahead.**

A.      My comment was more toward the fact I know there have been numerous modifications to leases and that I wasn't aware that I had all of those modifications but had no reason to believe otherwise.

Q.      **And you have not taken any steps to compare the lease rates in the leases you have to what the market is for lease rates.**

A.      That's correct.

Q.      **And you have not been employed to compare**

**the lease rates and the leases you have to what the**
**market is.**

A.     I would say that in the conduct of a
feasibility analysis that that could be required at
some point.

Q.     **But you have not been asked to do it.**

A.     I have been asked to conduct a feasibility
analysis which takes a series of steps.  That is a
step in a feasibility analysis.  I have not completed
that step because I don't know that that step is even
necessary because even if we say all the leases are
market rate, if we say all the leases are double
market rate, it still doesn't impact the feasibility
of the plan.  Or the lack thereof.

Q.     **Can you give me a definition of**
**feasibility?**

A.     Is it likely to be successful.  Is it -- I
am incorporating in that is it in fact a plan that
maximizes the value to the estate relative to other
alternatives.

Q.     **Have you done any analysis of the**
**inventory of commercial properties in southwest**
**Florida available for sale?**

A.     Other than what is in CoStar?

Q.     **Yes.  I am asking if you have done an**

**analysis, not if someone else has.**

A.     By formal analysis –– I have not prepared
an analytical report of that.  As I mentioned, I am
working with a very large portfolio down there and I
analyze inventory that is for sale on a weekly basis.

MR. BERMAN:  You have a document called a
Property Condition Assessment.  Let's mark that
as Exhibit 16.

(Exhibit 16 was marked for
identification.)

**Q.     (By Mr. Berman)  Mr. Gaudet, have you seen**
**Exhibit 16 before?**

A.     I don't know if this is the one that I ––
no, I don't believe I have.

**Q.     Do you know where this document came from?**

A.     I would assume it came from Property
Solutions or CWCapital, but I don't know.

**Q.     This was produced to us by CWCapital's**
**lawyers.  It appears to be over a year old.  You**
**haven't seen it until today?**

A.     I am sorry.  I thought this said 2010.  I
have a property condition report.  I knew it predated
September 2010.

I do have it.  This is the one that I
have.

1    Q.    And have you read it?

2    A.    I have not.

3    Q.    So you didn't take it into account in

4    rendering your position today on the financial

5    calculations that you have done.

6    A.    Which position are you referring to?

7    Q.    Well, any of the positions that you shared

8    with us on the record today.

9    A.    I mean, I don't think I have shared any

10   financial calculations that had anything to do with

11   the property condition assessment so no.

12   Q.    Have you taken this report into account in

13   any of your opinions?

14   A.    No.

15   Q.    Do you know when CW's counsel had

16   possession of this document?

17   A.    I don't know.  I got it sometime between

18   the last hearing, October 6th, and last week.  I just

19   don't know when.

20   Q.    There are a couple of site inspection

21   reports that were prepared by CWCapital.

22   A.    Yep.

23   Q.    Do you have those in front of you?

24   A.    Yep.

25   Q.    I am showing three separate reports.

A.    I have got a Wachovia Securities report,
Wachovia Securities and CWCapital.

**Q.    Let's mark the CWCapital -- find a date --
report dated September 27, 2010, go ahead and mark
that as Exhibit 17.**

A.    Where are you finding the date?  Which
date are you looking at?

**Q.    On the front page there is something
called date of inspection.  Do you see that?**

A.    Yep.

(Exhibit 17 was marked for
identification.)

MR. BERMAN:  We have another one, another
report with a date of August 21, 2009, make that
Exhibit 18.

MS. FERRIS:  Steve, can we go off the
record for a second.  I need to get the first one
you marked.  Bear with me a second.

(Recess from 1:30 p.m. to 1:40 p.m.)

(Exhibit 18 was marked for
identification.)

MR. BERMAN:  Back on the record.

**Q.    (By Mr. Berman)  Mr. Gaudet, do you have
Exhibit 17 report in front of you?**

A.    I do.

Q.     And did your review of that report affect
in any way your analysis of feasibility?

A.     No.

Q.     How about the Exhibit 18 report, did that
affect your view of feasibility?

A.     Nope.

Q.     Mr. Gaudet, it is my understanding that
you have not prepared a written report of your
opinion; is that correct?

A.     That's correct.

Q.     Have you been asked to prepare one?

A.     We have discussed it.  They have not
formally asked for it.  Primarily because we did not
yet have the information with which to conduct it.

Q.     What information were you missing?

A.     The number.  The value.

Q.     Okay.  Did you prepare a written report
based upon a $10 million value which was the old
value?

A.     I did not.

Q.     Can you describe for me based upon your
oral opinion today of feasibility specifically --

MS. FERRIS:  Objection to form.

Q.     (By Mr. Berman) -- what facts or data you
relied upon?

A.    The facts are primarily within the plan
itself.  The uniqueness of this plan is that the value
of the property becomes somewhat immaterial.  You can
say it is worth as much or as little as you like
because you are basically under the plan contemplating
backing into a number that makes the plan feasible.
That in and of itself in my mind is what makes the
plan infeasible.  I could sit here and tell you the
property is the worst thing ever to grace a piece of
real estate.  In fact, I could say the property is
worth zero, and then we should just tear up the
mortgage and I will go home.  Or I can argue that the
property is worth a hundred million dollars in which
case we would have to justify whether or not he could
pay that.  But what it comes down to is the way the
plan attempts to address this is by saying tell me
what plan is feasible and I will take it.  So that is
where the analysis comes out is the plan becomes
infeasible because you end up chasing your tail.

Every time you adjust the value, there is
a value to the financing terms that are anticipated
which makes the plan infeasible relative to a
Chapter 7 liquidation.

**Q.    Let me go back to my question.  You have
told me that the facts you relied upon or the data you**

**relied upon is found exclusively within the plan; is**

**that correct?**

    A.    No.  I think it is found within the plan,

the financials, the appraisals, you know, probably

most heavily within the concept of the plan and the

appraisals.

    **Q.    Which financials and which appraisals?**

    A.    For the sake of our analysis, we focused

primarily on the debtor's appraisal for no other

reason than since they had already stipulated to a

value there was really no sense in arguing over value.

So we took the debtor's appraisal at face value, used

that to determine the financial viability of the plan

relative to the financing.

    **Q.    And what financials did you rely upon?**

    A.    All the operating reports.

    **Q.    Can you describe for me the principle and**

**methods of analysis that you used to assess the facts**

**in the plan, the financials and the appraisals?**

        MS. FERRIS:  Can you clarify which plan

    you are referring to?

        MR. BERMAN:  The plan the witness was

    referring to.

        THE WITNESS:  I guess I was --

        MR. BERMAN:  We can say both plans.  I

assume he has read both plans.

THE WITNESS:  The question again was what?

**Q.     (By Mr. Berman)  Can you describe for me the principles and methods you used to analyze the facts borne out in the plans, both plans, the financial statements, you described them as the operating reports, and the appraisals you reviewed.**

A.     And I will address those independently. As to the first plan which stipulated a value of I think 10.2 less the initial cash payment, we relied more heavily because we had a final number on the property on the viability of the operating statements and budget provided at that time which -- and we made assumptions both ways, one assuming you continue making the contractual payments of 141,000; second, assuming you were able to somehow reamortize the debt and still leave the balloon in the same place.  So assess both of those from a simple factor of is there enough cash generated given the debtor's budget to service a debt.

As to the second plan, we don't know the number; but if we use the 10.2 number, the only real difference is that we have dramatically haircut the budget which presumably is going to, under the concept envisioned by the plan, allow you to reduce the net

principal calculation, this notional value that I
referred to.

So it is a simple -- we didn't go in and
question valuations.  We have not had the opportunity
to question or review budgets and pro forma
assumptions.  As to the original plan, it really
wasn't necessary because even if we gave the debtor
the benefit of the doubt on every issue, the plan
still was not financially feasible.  At some point if
we are to ignore the existing appraisals and come up
with some different value and taking into account that
the plan calls for nonrecourse 100-percent financing,
then the plan becomes financially infeasible from a
structural perspective relative to the alternatives.

**Q.      And which principles or methodologies did
you use to come to those conclusions, that was what I
was really trying to understand.**

A.      I am not sure if I understand the
question.

**Q.      Which financial principles or financial
methodologies did you use to come to your conclusions
in analyzing the financial feasibility of plan 1 and
plan 2?**

A.      Well, for the financial principles as to
2, determining the band of investment, we used the

band of investment principle.  As to No. 1, we used

mathematics, income minus expenses.

**Q.    Remind me again if you would what your**

**band of investment theory is.**

A.    It is not my theory.  It is a financial

theory.  Band of investment -- in an appraisal if you

look at the appraisal it describes it to some detail

within the appraisal.  But investment returns are

based upon risk.  So a senior lender who generally has

a margin property within some acceptable margin range

is going to have a lower risk component so they get a

lower return.  So if you go out and buy an investment

property for a hundred thousand dollars and you expect

a 15-percent return, then you would need to be able to

sell that property in one year for 115,000.  If you

could buy that same property for 90,000 and pay --

let's say you buy the same property for a hundred

thousand, you finance 50 percent for 50,000, that

costs you $5,000, so 10-percent interest for one

year -- are you following this?

**Q.    Yes.**

A.    I can't tell from the video.

So you have only committed 50,000 of

capital, your return expectation is still 15 percent.

So 50,000 times 15 percent is going to be, what is

that, $7500 return is what you would need over one

year.  Plus you had to pay $5,000 interest.  So now to

achieve your target return of 15 percent, by using the

leverage at 50 percent you only need a 12-1/2 percent

increase in value versus a 15-percent increase in

value had you funded 100 percent of it out of capital.

So when you take that band of investment

theory which is commonly accepted and used in

appraisal valuation and you assume that there is no

equity capital, return on equity becomes exponential

to the extent there is anything.  But more importantly

it causes the cost of borrowed money to equal the

expected return.

So if you were to borrow -- in my earlier

scenario, if I were to come to you and say you can buy

this property, you can sell it a year from now for

$115,000, if you wanted to find a lender who was going

to accept 100 percent of that risk you would say,

well, heck, what do I need you for, I will take the

15-percent return, your return on equity will be zero.

Same scenario, your cost of funds in that case would

have to move to a point that it equals the discount

rate, 15 percent.

So, I mean, the principal is that the

discount rate is set, it is set by your appraiser.

Now, we could argue over that discount rate all day
long; appraisers can argue about that.  But if I
accept your appraiser's discount rate and then I want
to determine based on that discount rate how the band
of investment breaks out, investor return versus
equity, versus lender return, if investor is zero and
lender is 100 percent, mathematically the lender's
rate of return has to equal the discount rate.
Otherwise you created --

    **Q.**    **What is the appropriate discount rate in
this case?**

    A.    I think your appraiser used -- depends on
which valuation method you are using, but I think he
used 12-1/4.

    **Q.**    **Let me back up a second.  Do you have an
opinion as to the appropriate discount rate?**

    A.    I do not.

    MS. FERRIS:  Objection.

    THE WITNESS:  And I don't know that it
matters.  Because whatever discount rate you use,
the theory remains the same.  If you put a
2-percent discount rate on this, if you offer
this in the market, to the open market with no
risk, nonrecourse financing, 100 percent,
somebody will pay a higher price than market

value, whatever market value is.  If it is a

dollar, somebody will pay more.

**Q.     (By Mr. Berman)  You don't have any**

**opinion as to what the market value of the property**

**is.**

A.     I don't know that it matters because

whatever the market value is is going to set the bar

for the balance of the calculation.

**Q.     Mr. Gaudet, I would like you to answer my**

**questions.  Do you have an opinion as what the market**

**value of the property is?**

A.     I have the opinion determined by the

appraisers.

**Q.     What is your opinion of the market value**

**of the property?**

A.     I have no opinion.  It is stipulated that

the value is $10 million, 10.2 million.

**Q.     And the band of investment theory that you**

**talk about is a valuation theory, is it not?**

A.     It is used in valuation.  It is not a

valuation theory.  It is a financial theory.

**Q.     Do you believe it was properly applied in**

**the opinion of the two appraisers?**

A.     I have no reason to question either of the

appraisers.  I think their appraisals came out

relatively close. I have no opinion as to whether or not they are accurate or not. Nor do I think it impacts the feasibility of the plan.

**Q. Where did you learn about this band of investment theory?**

A. I don't recall. I mean, it is commonly used in the banking and finance industry. I majored in commercial banking so I am sure I first saw it back in 1980.

**Q. Let me review my notes briefly. We may be close to a stopping point.**

**Mr. Gaudet, you talked about the pro forma financials attached to the original disclosure statement. Do you remember that testimony?**

A. Yes.

**Q. And you indicated today that you didn't have any reason to challenge the pro forma financials attached to the original disclosure statement.**

A. I didn't say that I didn't -- I don't have a reason from the perspective of feasibility to challenge it. Again, it is your plan so I am not explaining anything to you. I could challenge it and tell you it is a hundred thousand higher or a hundred thousand lower, it is just going to move the number around. So that's a valuation issue that the

appraisers are paid and qualified to answer.  But my

testimony is more to the financial feasibility of the

structure which I think is invalid.

I am happy to share with you my thoughts

on that if I can find it.  I haven't looked at it in a

while.

**Q.      Why don't you look at tab 1 in your**

**notebook.**

A.      Your notebook.

**Q.      In the exhibit notebook.**

A.      You are referring to the budget, correct?

**Q.      Well, you indicated to me it was in the**

**original disclosure statement.**

A.      Yeah.

**Q.      So that's where I wanted to direct you,**

**but if you have a copy of the old budget in another**

**location, let me know.**

MS. FERRIS:  Tab 1 is the third amended,

are you trying to refer to the original

disclosure or third amended disclosure?

MR. BERMAN:  The witness indicated he had

the pro forma attached.

THE WITNESS:  There was no budget attached

to any subsequent disclosure at least that I was

able to locate.  But I am referring to --

1      **Q.    (By Mr. Berman)  What budget were you**

2  **looking at?**

3      A.    The original budget?

4      **Q.    Yes.**

5      A.    You provided a budget -- hang on.  Let me

6  find it.

7      As part of the second amended I guess is

8  where it came from.  It is called the North Bay

9  Village Future Operating Budget, filed 5/13/2010, Page

10  2 of 2.  It starts off at the top, it has got, same

11  format, 2011, '12, and '13, it provides the income,

12  again, not in the conventional format, the gross lease

13  income on each tenant, provides the breakdown of

14  expenses.  Then it provides annual cash flow at the

15  bottom after debt service, assuming 50,000 a month in

16  debt service.

17      MR. BERMAN:  Let's go ahead and mark the

18      budget you are looking at as Exhibit 15A as in

19      apple.

20      MS. FERRIS:  Steve, can we take a short

21      break because I don't have a copy of that.

22      (Exhibit 15A was marked for

23      identification.)

24      (Recess from 2:02 p.m. to 2:06 p.m.)

25      **Q.    (By Mr. Berman)  Mr. Gaudet, if you can**

take a look at Exhibit 15A which is the May 13, 2010,
budget according to your testimony and put that side
by side with Exhibit 15.

    A.    Okay.

    Q.    And I just want to make sure I understand.
You are not challenging the assumptions or conclusions
in either of those pro forma budgets, are you?

    A.    I don't know that I wouldn't challenge
them.  I have not conducted an analysis of these such
that I would need to to argue the feasibility of the
plan.

    Q.    So sitting here today --

    A.    I haven't gone in and tested property tax
to determine that, in fact, it is $149,176.  I have
taken this at face value.  I mean, there are things on
here which, you know, looking at my notes in the
margins, I would -- if in fact this became something
that were material to the feasibility of the plan,
that I would definitely go back and look at.

    Q.    You don't think the operating budget is or
projections of financial performance is germane to
feasibility?

    A.    Not the way the plan is proposed.  The
financial performance -- you know, what you are doing
is starting off with the answer and asking the

question.  So whatever you adjust this to, it is just
going to change the definition of net principal.  So
there is no way as structured you could make a plan
that you can financially feasibly perform under.  All
you are doing is lowering the bar.  If every time you
run at it, you hit it, you just lower it a notch until
you make it over.

That's basically what the plan says, let
us lower the bar until we can make it over.  The plan
is beautiful in the concept that you can't fail.  Now,
where the plan falls apart is in the concept is this
the best return for the creditors.

Q.      **Let me ask the question I have asked now a**
**couple of times again and see if you can answer it.**
**Are you challenging the assumptions in either**
**Exhibit 15 or 15A?**

A.      I would reserve -- if, in fact, we nailed
down the number and it was dependent upon that, then I
would want to come back and look at it.  I think the
assumptions in 15 and 15A are moot.  You can put
whatever number you want in here, it is moot.

Q.      **Is your view that using a valuation number**
**of anything less than the debt that you described as**
**23-1/2 or $29 million, is using a valuation number at**
**anything less than that what makes this plan**

**infeasible in your view?**

A.    No.

Q.    **What makes it infeasible?**

A.    I think what makes it infeasible is -- if
we accept that to be feasible it has to provide the
highest possible return, then we are not giving credit
for the value of the plan financing terms that you are
putting into the plan.  Whether they are market rate
or not, financing has value, particularly in today's
market.  So anywhere that you get 100-percent
nonrecourse financing, there is value.  That value is
calculated mathematically through the band of
investment.  We are not giving that value.

Q.    **Well, let me take it step by step.  This**
**financing in the plan is proposed at 6.034-percent**
**interest.  Do you agree with that assumption?**

MS. FERRIS:  Can you clarify which plan we
are referring to.

MR. BERMAN:  The only plan that is on the
table.  The second amended plan that was filed in
October.

MS. FERRIS:  Okay.  Just clarifying.

THE WITNESS:  Your question was you want
me to verify that 6.034 is the proposed rate?

Q.    **(By Mr. Berman)  I want -- yes.**

1    A.    Okay.

2    Q.    **You can look at the plan if you need to.**

3    A.    No.  That's correct.  That's my

4    understanding.

5    Q.    **So you said financing has value.  Part of**

6    **the value of the financing you would agree is**

7    **6.034-percent interest return, correct?**

8    A.    I am not sure I understand the question.

9    Q.    **What is the value of the financing under**

10   **this plan to you?  What calculation have you put on**

11   **that value?**

12   A.    When we nail down the final number that

13   you intend to use, we can give you a specific.  But

14   using the 10 million, 10.2 million, that value comes

15   out somewhere between one nine and 2.2 million,

16   depending on which of the appraiser's three scenarios

17   you accept.  We have changed the scenarios, so you

18   would have to basically recalculate the entire

19   process.

20   Q.    **So what rate of interest over and above**

21   **6.034 percent do you believe is needed to compensate**

22   **this investment band interest rate?**

23   A.    How much equity are you anticipating in

24   the project?  Are you providing a hundred-percent

25   financing?

**Q.    I am asking you to take the second amended plan at 6.034 percent and you tell me what you believe the appropriate interest rate is for the refinancing as contemplated in the plan that is on the table based upon a $10 million valuation.**

A.    I would tell you that the appropriate interest rate is that rate which consumes all of the cash flow and all of the property appreciation over the life of the plan.

**Q.    Which is what?**

A.    It depends on what value you want to use today.

**Q.    I have asked you to use the $10 million value.**

A.    Then it is 10 million.

**Q.    So you want $10 million worth of interest --**

A.    All the income.  If there is no equity, so if I am a hundred percent of the exposure, I am the lender, absent equity risk, then my rate should equal the discount rate.  The discount rate basically calculates the value by taking all future cash flow and discounting it back at the discount rate which was, in my scenario, selected by your appraiser.  I don't have a vote.  He says 12-1/4.  So if I take all

the cash flows, discount them back to 12-1/4, then my
interest rate is 12-1/4.  If somebody puts in
10-percent equity, then you get into the whole band of
investment theory.  For him to get a 12-1/4 return,
what type of rate should I have on the loan.  If there
is no equity, the interest rate is always going to
equal the cap rate.  It is just math.  It won't
balance any other way.

    **Q.**    **Do you have an opinion as to what the
market rate of interest is for a loan of this type?**

    A.    You cannot get a hundred-percent
nonrecourse loan so no, I don't know where you would
find a loan of this type.

    **Q.**    **Okay.**

    A.    But I would tell you, I guess, to the
extent -- I will qualify that.  I guess you could get
basically a mezzanine loan which would essentially
say, yes, we will put in a hundred percent of the
money but we want a hundred percent of the return.  So
once again it brings us back to the whole concept of
it is equal to the discount rate on the property.

    **Q.**    **Are you familiar with any loans that have
been made of this type in the past six months?**

    A.    Hundred-percent nonrecourse real estate
loans?

1  **Q.**    **Correct.**

2  A.    No.  I am not familiar with any loans of

3  this type in 30 years at a hundred-percent nonrecourse

4  on a distressed property.

5  **Q.**    **Do you have an opinion as to what interest**

6  **factor ought to be added to 6.034 percent to provide a**

7  **market rate of interest on this loan?**

8  A.    Given the proposed terms of the loan, it

9  would be that number that you get by deducting 6.034

10 from the cap rate used by whatever valuation you are

11 accepting.

12 **Q.**    **So you think you should use the cap rate**

13 **as the interest rate on this loan?**

14 A.    That's what the math says, yes.

15 **Q.**    **What math says that?**

16 A.    The band of investment theory.  If there

17 is a -- the cap rate tells you what a prudent investor

18 would demand in return.  These are USPAP; I didn't

19 make this up.  Cap rate is what a prudent investor

20 would demand for return on an investment given the

21 risk and the variables.

22        Now, for him to get that return, he may

23 use leverage which allows him to put less money in and

24 get a higher return; but absent equity leverage, the

25 cost of funds is your cap rate.

Q.     But you are not aware of any loans being made on a hundred-percent basis on a nonrecourse level.

A.     Why -- I am sure you are a nice guy, but why would I loan you a hundred bucks at 5 percent if you are going to --

Q.     It is a yes or no answer, sir.  What is your answer?

A.     I am sorry?

Q.     It is a yes or no question.  What is your answer?  Are you aware of any 100-percent nonrecourse loans being made?

A.     No.

Q.     Do you know what the prime rate of interest is today?

A.     3-1/4.

MR. BERMAN:  I don't have any further questions.

MS. FERRIS:  Can we take a short break so I can review my notes?

MR. BERMAN:  Sure.

MS. FERRIS:  Thank you.

(Recess from 2:18 p.m. to 2:22 p.m.)

MR. BERMAN:  Ready to go back on?

MS. FERRIS:  Yeah, that's fine.

1          I don't have any questions.

2          MR. BERMAN:  Will the witness read or

3 waive reading?

4          THE WITNESS:  I don't know if we are going

5 to have time between now and then.  If you don't

6 have any objection, I will waive.  No.  I would

7 like to read.

8          MR. BERMAN:  Okay.

9          (Deposition concluded at 2:24 p.m.)

10          (Pursuant to Rule 30(e) of the Federal

11 Rules of Civil Procedure and/or O.C.G.A.

12 9-11-30(e), signature of the witness has been

13 reserved.)

C E R T I F I C A T E

STATE OF GEORGIA:

COUNTY OF FULTON:


I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 88 represent a true, complete, and correct transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case.

This, the 15th day of November, 2010.



RENDA K. CORNICK, CCR-B-909

COURT REPORTER DISCLOSURE

     Pursuant to Article 10.B of the Rules and
Regulations of the Board of Court Reporting of the
Judicial Council of Georgia, I make the following
disclosures:

 1.   I am not disqualified for a relationship of
interest under the provisions of O.C.G.A.
Section 9-11-28(c).

 2.   I am a Georgia Certified Court Reporter.

 3.   I am present as a representative of
Regency-Brentano, Inc.

 4.   Regency-Brentano, Inc., was contacted by US
Legal to provide court reporting services for this
deposition.

 5.   I will not be taking this deposition under any
contract prohibited by Georgia law.




               Renda K. Cornick, CCR-B-909
               November 11, 2010

1    DEPOSITION OF:  RICHARD B. GAUDET/RKC

2        I do hereby certify that I have read all
     questions propounded to me and all answers given by me
3    on November 11, 2010, taken before Renda K. Cornick,
     and that:
4
         1)  There are no changes noted.
5        2)  The following changes are noted:

6        Pursuant to Rule 30(e) of the Federal Rules of
     Civil Procedure and/or the Official Code of Georgia
7    Annotated 9-11-30(e), both of which read in part:  Any
     changes in form or substance which you desire to make
8    shall be entered upon the deposition...with a
     statement of the reasons given...for making them.
9    Accordingly, to assist you in effecting corrections,
     please use the form below:

10

11   Page No.        Line No.        should read:

12
     Page No.        Line No.        should read:
13

14   Page No.        Line No.        should read:

15
     Page No.        Line No.        should read:
16

17   Page No.        Line No.        should read:

18
     Page No.        Line No.        should read:
19

20   Page No.        Line No.        should read:

21
     Page No.        Line No.        should read:
22

23   Page No.        Line No.        should read:

24
     Page No.        Line No.        should read:
25

DEPOSITION OF:  RICHARD B. GAUDET/RKC

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:


If supplemental or additional pages are necessary,
please furnish same in typewriting annexed to this
deposition.


                    RICHARD B. GAUDET

Sworn to and subscribed before me,
This the       day of              , 20   .


Notary Public
My commission expires:

**A**

**able** 6:15 36:14,19
71:16 73:14
78:25
**absent** 43:17 84:20
86:24
**accept** 39:5 46:7
48:17 74:18 75:3
82:5 83:17
**acceptable** 25:11
73:10
**accepted** 17:7
26:20 74:8
**accepting** 86:11
**access** 52:2 53:7
55:17
**accomplish** 24:24
26:13,17
**account** 27:5 29:5
47:17 51:6,10
66:3,12 72:11
**accountant** 18:5,8
18:10 19:7,20
**accounting** 18:7,20
19:3,6,7,9,12,15
**accounts** 19:18
**accruing** 51:13
**accuracy** 19:4
**accurate** 77:2
**achieve** 51:25 74:3
**acquisition** 16:11
**acquisitions** 7:16
**acted** 18:13,15,16
18:22 19:1
**action** 14:6
**actions** 14:19
15:24
**active** 52:6
**activity** 23:24
55:16
**added** 11:14 35:23
86:6
**addition** 13:21,22
**additional** 11:14
14:16 15:11 22:4
23:17 92:14
**additions** 12:2
**address** 34:23
69:16 71:8
**addresses** 54:12
56:15
**adjust** 69:20 81:1
**Adventure** 9:25
10:15
**advising** 53:10
**advisory** 6:21,22
6:23
**affect** 15:23 35:3

54:25 68:1,5
**affiliated** 13:14
13:15
**ago** 62:23
**agree** 34:11 45:20
82:16 83:6
**agreed** 50:4
**agreement** 23:10,18
59:10
**ahead** 30:7 50:4
62:25 63:16 67:4
79:17
**AIB** 8:5
**Airport** 54:21
**allegedly** 17:24
**alleges** 17:22
**allow** 43:5 50:10
71:25
**allows** 86:23
**all-in** 45:2
**alternatives** 47:17
64:20 72:14
**amended** 2:4,5,6
23:8 41:6 78:18
78:20 79:7 82:20
84:1
**amendments** 52:6
**amortization** 37:17
38:14 49:1,7
**amortize** 36:25
**amount** 18:6,24
30:5 31:5 35:24
37:5 50:23
**amounts** 63:8
**analyses** 35:15
36:7,17 39:18
40:4 42:13 44:13
51:19 53:9
**analysis** 8:4 27:1
29:13,24 35:8,18
36:16 38:8,23
39:1,4,13 40:8
42:6,14,15,24,25
43:19 48:15 50:7
51:17,18,25
57:12 58:14,14
61:9 62:7,12,17
64:4,8,9,21 65:1
65:2 68:2 69:18
70:8,18 80:9
**analytical** 65:3
**analyze** 65:5 71:4
**analyzing** 72:22
**and/or** 88:11 91:6
**annexed** 92:15
**Annotated** 91:7
**annual** 79:14
**answer** 6:4 8:9
28:9 32:13 35:19

62:19,20,21,25
63:2 76:9 78:1
80:25 81:14 87:7
87:8,11
**answers** 6:14 27:21
89:9 91:2
**anticipated** 69:21
**anticipating** 83:23
**anyway** 40:13 57:10
**anywise** 89:17
**apart** 81:11
**APPEARANCES** 4:1
**appears** 65:19
**apple** 79:19
**applicable** 48:4
**application** 39:11
**applied** 38:13
76:22
**applies** 40:12
**apply** 37:25 38:4
45:6
**applying** 36:2,4
**appraisal** 22:15,19
22:20,21 24:1,2
24:3,5 26:21
42:4 43:7,8,8,11
44:20 70:9,12
73:6,7,8 74:9
**appraisals** 48:23
52:24 60:14,14
70:4,6,7,19 71:7
72:10 76:25
**appraised** 35:25
44:10,17,18 45:9
45:11,13
**appraiser** 43:18
45:6,11 74:25
75:12 84:24
**appraisers** 75:2
76:13,23,25 78:1
**appraiser's** 75:3
83:16
**appreciate** 34:17
**appreciation** 84:8
**approach** 24:25
25:6
**appropriate** 62:8
75:10,16 84:3,6
**appropriateness**
62:12
**approved** 17:15
**April** 2:10
**area** 6:7 8:25
20:10 53:9
**argue** 69:12 75:1,2
80:10
**arguing** 70:11
**argument** 36:3
**argument's** 48:22

**arising** 32:20
**Armalavage** 24:6,8
24:9
**Army** 7:20
**Article** 5:2 31:25
90:4
**asked** 6:5 36:17
40:3 42:11 48:10
51:10 59:5 62:11
64:6,7 68:11,13
81:13 84:13
**asking** 20:8 30:19
59:24 64:25
80:25 84:1
**assess** 29:14 70:18
71:18
**assessment** 3:4
60:15 62:5 65:7
66:11
**Asset** 57:1
**assets** 7:13 54:10
**assigned** 36:23
**assignee** 18:23
**assignment** 18:23
18:25
**assist** 53:17 91:9
**assisting** 53:10
**associated** 38:1
43:6,19
**Associates** 24:6,9
**assume** 5:23 29:19
29:19,22 30:2
32:15 38:5 44:21
44:23 45:10,19
65:16 71:1 74:9
**assumes** 42:25 43:8
50:22
**assuming** 35:24
71:14,16 79:15
**assumption** 35:8
42:11 82:16
**assumptions** 58:14
58:15 59:4,15,16
60:7,9 61:19
71:14 72:6 80:6
81:15,20
**as-is** 22:23
**Atlanta** 1:14 7:1
53:4
**attached** 3:8 28:7
77:13,18 78:22
78:23
**attained** 23:20
**attempt** 25:17
**attempts** 69:16
**attend** 8:6
**attended** 8:1,2
**attention** 31:9
**auction** 46:14 47:2

**audible** 6:14
**audit** 18:24 19:2
**audited** 26:19
**auditing** 18:17
**auditor** 18:13,14
  18:15,16
**August** 2:14 3:6
  20:3,4 21:8
  67:14
**available** 22:6
  50:21 51:1,9,14
  64:23
**Avenue** 4:5
**average** 59:22
**aware** 51:12 63:19
  87:1,11
**a.m** 1:11 19:23

**B**

**B** 1:8 5:7 91:1
  92:1,17
**back** 10:24,25 11:1
  11:17,18 15:7
  19:24 20:11 21:2
  22:2 27:17,19
  31:18 35:21 37:1
  37:9,12,16 38:6
  39:10 42:8,22,23
  48:13 50:7 55:24
  58:17 63:9 67:22
  69:24 75:15 77:8
  80:19 81:19
  84:23 85:1,20
  87:24
**background** 7:25
**backing** 69:6
**backs** 56:5
**balance** 24:19 28:4
  29:23 37:4 76:8
  85:8
**balloon** 71:17
**band** 44:21 72:25
  73:1,4,6 74:7
  75:4 76:18 77:4
  82:12 83:22 85:3
  86:16
**bank** 7:22 13:18,19
  14:4,25 15:6,17
  15:18 16:20
  25:12
**banking** 8:4,20
  15:5,9 18:4 77:7
  77:8
**bankruptcy** 1:1
  5:17 9:8,11,22
  10:1,16,21,23
  11:3 12:20 22:7
  25:5,5,9,10,13
  25:15 26:6,10

**bank's** 16:1 25:12
**bar** 76:7 81:5,9
**base** 61:14
**based** 25:21 34:10
  36:7 37:6 46:22
  49:3 50:16 61:19
  68:18,21 73:9
  75:4 84:4
**basically** 25:20
  26:17 46:2 58:5
  69:5 81:8 83:18
  84:21 85:17
**basis** 21:15 34:16
  50:10 53:21
  56:14,17 65:5
  87:2
**Bay** 1:5 4:7 5:16
  20:1 32:6 34:24
  53:15,19,23
  56:20 57:2 58:10
  59:23 60:17
  62:13 79:8
**Bear** 67:18
**beautiful** 81:10
**beginning** 45:10
  50:22
**behalf** 4:3,7 10:11
  13:17 14:3,7
  15:17 22:16 25:7
**believe** 10:23
  24:18 27:4,6
  33:6 50:17 57:13
  60:19 61:6 63:20
  65:14 76:22
  83:21 84:2
**below-market** 43:16
**benefit** 18:23 72:8
**Berman** 4:8 5:11,15
  9:17 11:11,17
  12:15 19:22,24
  20:24 21:3 30:11
  30:15,19,24
  32:13 33:2 34:3
  34:13,17,19
  36:13 37:6 40:2
  40:18 41:3,11,17
  41:25 49:23 50:3
  55:11 57:19,23
  60:25 61:2 65:6
  65:11 67:13,22
  67:23 68:24
  70:22,25 71:3
  76:3 78:21 79:1
  79:17,25 82:19
  82:25 87:17,21
  87:24 88:2,8
**best** 55:5 81:12
**better** 55:8
**beyond** 17:17

**big** 56:3
**billion** 53:11 54:9
**binder** 24:17 56:24
**bit** 26:14 48:5
**blend** 45:5
**blended** 44:22 45:4
**Board** 5:3 90:4
**boilerplate** 31:17
**Bonita** 34:25 54:9
**book** 41:7
**bookkeeper** 18:11
  19:7
**borne** 71:5
**borrow** 74:14
**borrowed** 74:12
**borrower** 25:8 32:3
  32:3,4,8,18 35:2
**borrower's** 23:25
  43:8
**bottom** 79:15
**Boulevard** 4:10
**break** 6:2,2,7,8
  20:17,23 30:9,21
  50:6 61:16 62:4
  79:21 87:19
**breakdown** 79:13
**breakout** 61:20
**breaks** 6:5 75:5
**briefly** 7:20,24
  20:11 59:9 77:10
**bringing** 14:5
**brings** 85:20
**bucks** 87:5
**budget** 2:22 26:16
  50:13 58:14,16
  71:13,19,24
  78:11,16,23 79:1
  79:3,5,9,18 80:2
  80:20
**budgets** 51:21 72:5
  80:7
**build** 16:15
**building** 56:6,8
**built** 56:8
**bulk** 24:15
**Burr** 4:4
**business** 16:18
  18:11 19:16
  51:22
**buy** 44:1,3 73:12
  73:16,17 74:15
**buyers** 46:13
**buys** 46:5

**C**

**C** 89:2,2
**calculate** 40:10,13
  51:10
**calculated** 36:1

82:12
**calculates** 84:22
**calculation** 29:5
  72:1 76:8 83:10
**calculations** 61:17
  66:5,10
**calculator** 37:11
**call** 15:3 20:7
  27:19,20 38:24
**called** 12:3 16:14
  37:16 38:10
  44:21 57:16 65:6
  67:9 79:8
**calls** 32:12,24
  33:24 43:12
  72:12
**CAM** 59:11,19 61:14
  61:24,25
**camera** 30:18
**cap** 43:8,10 85:7
  86:10,12,17,19
  86:25
**capacity** 19:19
**capital** 6:21,22,23
  37:8 73:24 74:6
  74:10
**capitalized** 33:15
**caption** 89:9
**car** 44:1,3
**carry** 46:18
**case** 1:5,6 5:17
  9:20 10:4,10,14
  10:15 14:12
  16:24,25 17:2,8
  17:13,16,18 21:5
  21:22 22:5 25:13
  26:5,12 27:3,9
  28:2 29:14 45:4
  55:18 69:14
  74:21 75:11
  89:15,17
**cases** 9:21 11:14
**cash** 26:18,20 45:2
  45:22 46:7,8,12
  46:14,19 49:4
  50:21,22 51:8,12
  51:13 71:10,19
  79:14 84:8,22
  85:1
**catchall** 47:11
**caused** 24:23
**causes** 74:12
**CCR-B-909** 1:15
  89:21 90:17
**centered** 42:6
**certain** 18:9,24
  25:8 44:2
**certifications**
  8:19

**Certified** 90:9
**certify** 89:7,14
  91:2
**challenge** 77:17,21
  77:22 80:8
**challenges** 17:10
**challenging** 80:6
  81:15
**change** 81:2
**changed** 26:16,16
  83:17
**changes** 52:5 91:4
  91:5,7
**Chapter** 1:6 5:16
  16:18,19 42:17
  43:1 44:6,7,11
  44:14 52:1 69:23
**characteristics**
  55:10,11
**charge** 43:23
**chasing** 58:20
  69:19
**Chatham** 13:3 14:20
  17:18,21
**checks** 19:20,21
  38:20
**chief** 19:1
**circumstances**
  18:19 20:5 48:2
**cities** 6:11
**city** 14:12
**Civil** 88:11 91:6
**CKS** 32:6
**claim** 13:19 14:6
  27:5,12 28:2,11
  28:13,14,15,22
  29:1 37:5 39:6,7
  39:16,16
**claims** 14:24 15:3
  15:14
**clarify** 36:9 39:23
  41:1 55:3 61:11
  70:20 82:17
**clarifying** 82:22
**cleanest** 43:24
**clearly** 43:11
  56:11 62:2
**client** 17:2 54:2
**clients** 39:2
**client's** 45:11
**close** 36:5 77:1,11
**closer** 28:6 54:3
  54:18
**closing** 15:16
**closings** 15:21
**Code** 91:6
**collateral** 23:9
  32:22,22,25 33:3
  33:12,20,22,25

34:1,3 35:3,6
  51:13
**collaterally** 34:1
**collect** 38:19
**collection** 35:5
**come** 21:25 26:2
  30:3 36:5 48:23
  56:3 72:10,16,21
  74:15 81:19
**comes** 29:21,23
  36:3 54:1 69:15
  69:18 83:14
**comment** 63:14,17
**commercial** 9:4
  16:5 19:16 64:22
  77:8
**commission** 92:21
**commitment** 15:6
  28:3
**committed** 73:23
**common** 46:3
**commonly** 74:8 77:6
**community** 13:18,19
  14:4
**companies** 19:2
**company** 9:2 19:14
  32:6
**comparable** 52:1
**comparable-type**
  58:7
**compare** 56:20
  63:22,25
**compared** 55:8 63:7
  63:15
**comparing** 53:22
**comparison** 55:12
  56:14,17
**compensate** 83:21
**compensation** 21:15
**complete** 8:2 89:12
**completed** 64:9
**completely** 5:22
**component** 19:10,12
  73:11
**comprehend** 52:25
**computer** 20:18
**concept** 70:5 71:24
  81:10,11 85:20
**conclude** 35:15
  36:14
**concluded** 88:9
**conclusion** 32:12
  32:24 33:24
  34:10 41:15
**conclusions** 72:16
  72:21 80:6
**condition** 3:4
  23:11 25:12
  55:15 65:7,22

66:11
**conditions** 23:14
  23:14 31:19,23
**condo** 14:24
**condominium** 23:21
  34:23
**conduct** 48:14
  61:20 62:11,17
  64:3,7 68:14
**conducted** 15:17
  26:19 61:8 62:7
  80:9
**CONFERENCE** 1:7
**confines** 29:10
**confirm** 41:13
**confirmation** 25:15
  26:11 57:2
**confirmed** 17:13
**conjunction** 53:15
  53:16 55:5 57:12
  58:9,11
**connotation** 18:9
**consistently** 25:4
**Consolidated** 31:4
**consolidation** 23:4
**constant** 34:16
**constituency** 10:9
**constitutes** 15:5
**construction** 55:18
**consumes** 84:7
**contacted** 90:11
**contemplate** 40:24
**contemplated** 42:22
  48:12 84:4
**contemplates** 40:20
  43:11 44:15
**contemplating** 69:5
**CONTENTS** 2:1 3:1
**continue** 71:14
**contract** 48:25
  90:14
**contractual** 71:15
**conventional** 18:3
  79:12
**copies** 21:24 22:3
  23:2,19 52:7
**copy** 11:8 20:19,20
  20:21,23 23:9,12
  23:18,19 50:6
  78:16 79:21
**copycat** 14:23 15:3
**Cornick** 1:15 89:21
  90:17 91:3
**correct** 11:6 12:21
  13:6,7,24 14:22
  15:10 16:4,8
  21:16 22:25 31:8
  33:9 35:13,21
  42:8 47:7 51:3

52:3,17 59:15
  60:24 63:24 68:9
  68:10 70:2 78:11
  83:3,7 86:1
  89:12
**corrections** 91:9
**correctly** 35:12
  47:6
**cost** 37:8 38:5
  44:22 74:12,21
  86:25
**CoStar** 2:20 23:13
  23:15 57:16 58:2
  58:4,5 64:24
**costing** 19:13
**costs** 73:19
**Council** 5:3 90:5
**counsel** 4:1 17:11
  23:12 66:15
  89:14,16
**County** 14:20 17:20
  34:25 53:25 89:5
**couple** 54:6,19
  66:20 81:14
**courses** 8:3,5
**court** 1:1 5:3 6:12
  6:15 9:6,9,13,22
  9:22 10:1,17,18
  10:19,21,22,23
  11:3 12:20,20,23
  13:2,4 14:15,21
  15:12 17:20 22:7
  23:12 25:13,15
  90:2,4,9,12
**covered** 24:16
  47:16 54:10
**covering** 36:5
**co-tenancy** 23:10
**created** 75:9
**credit** 8:4 43:7
  82:6
**creditor** 10:12
  11:3 16:24,25
  28:19 38:19
**creditors** 18:24
  81:12
**CROSS-EXAMINATION**
  5:10
**current** 11:24 12:1
  24:10 25:19,22
  40:15 45:9,9
  46:12,21,22 50:9
  50:12
**currently** 45:22
**curriculum** 11:24
  12:9
**customary** 15:20
**cut** 56:1
**CV** 2:17 9:13,17

11:7,18 12:12
**CWCapital** 3:5,6
4:3 22:16 51:14
57:1 65:17 66:21
67:2,3
**CWCapital's** 65:18
**CW's** 66:15
**C&I** 9:4

---
### D

**data** 58:6,16,23
68:24 69:25
**date** 12:2 20:15
22:19,22 24:13
67:3,6,7,9,14
**dated** 22:21 24:1
31:4 67:4
**day** 46:11 53:13
56:3 75:1 89:18
92:19
**days** 24:16
**dead** 56:4
**deal** 46:14 58:20
**deals** 54:19,20
**Debbie** 4:12
**debt** 9:2 25:6,7,23
25:24 27:2,3,4,8
27:12,15,17,18
27:19,20 29:19
29:22 35:4,6,25
36:5,24 39:12,14
43:17,22 45:7
46:19 50:21
51:24 71:16,20
79:15,16 81:23
**debtor** 1:6 17:3,6
35:16 36:14,19
49:2 72:7
**debtor's** 17:11
23:5,8 25:4 43:8
70:9,12 71:19
**declaration** 23:21
**deducting** 86:9
**defined** 32:14,25
40:11
**defines** 33:16
**definitely** 80:19
**definition** 33:4
64:15 81:2
**Dell-Powell** 20:7
**demand** 86:18,20
**dependent** 81:18
**depending** 27:20
29:17 43:15
83:16
**depends** 29:10
75:12 84:11
**deposition** 1:7
9:23 13:2,9

41:15 57:8 88:9
90:12,13 91:1,8
92:1,15
**derivative** 13:15
14:19,23
**describe** 7:24 8:22
9:11 15:1 20:5
21:10 68:21
70:17 71:3
**described** 33:6
71:6 81:23
**describes** 73:7
**Description** 2:3
3:2
**desire** 91:7
**desired** 17:5
**detail** 58:14 59:15
73:7
**detailed** 24:14
**determine** 25:21
27:9 33:10 42:21
59:20 60:12
70:13 75:4 80:14
**determined** 43:18
43:19 76:12
**determining** 72:25
**developer** 14:25
**developing** 53:18
**development** 16:12
16:12,15
**difference** 71:23
**different** 6:11
12:7 19:1 27:10
27:21 29:17 36:7
39:21 60:8 72:11
**digging** 59:14
**dime** 46:10
**direct** 78:15
**direction** 89:10
**disclosure** 2:4 5:1
22:2,9 23:8
77:13,18 78:13
78:20,20,24 90:2
**disclosures** 90:5
**discount** 36:2,3,4
38:1,4 43:18
44:19,19 45:6,8
45:25 74:22,25
75:1,3,4,8,10,16
75:20,22 84:21
84:21,23 85:1,21
**discounted** 43:17
**discounting** 37:3,8
84:23
**discounts** 39:11
**discussed** 20:11
68:12
**discussion** 11:12
21:1

**disqualified** 90:7
**distinction** 40:7
**distress** 56:12
**distressed** 55:25
86:4
**DISTRICT** 1:1
**DIVISION** 1:2
**document** 12:3,7
33:15,16 57:3,15
60:18 65:6,15
66:16
**documentation** 26:3
**documents** 12:8
22:3,10,10,17
23:2,21 24:12,13
24:14,19 32:21
33:19 34:1 53:6
**doing** 53:12 54:7
58:12 61:18
80:24 81:5
**dollar** 38:15 53:11
54:9 76:2
**dollars** 38:17
41:24 59:19
69:13 73:13
**door** 47:1
**double** 64:12
**doubt** 72:8
**dramatically** 71:23
**drawback** 55:19,20
**drive** 56:8
**driver's** 8:15
**duly** 5:8
**dying** 56:4
**D&O** 13:19 14:2,6
15:14

---
### E

**E** 89:2,2
**earlier** 26:25 47:4
50:14 63:5 74:14
**early** 10:3 20:2
**ease** 55:16
**easement** 23:19,20
**easier** 41:8 52:22
52:25
**East** 4:10
**educational** 7:25
**effecting** 91:9
**effective** 22:22
**efficient** 48:7
**either** 21:8 25:5
26:16 43:22
44:12,14 56:2
76:24 80:7 81:15
**elect** 28:14
**election** 27:25
28:10,10,17,20
28:20,22

**emerging** 23:13
**employ** 89:15
**employed** 6:20 7:8
7:19,22 58:16,18
62:13 63:25
**engaged** 8:24 21:4
48:6
**engagement** 19:11
20:13,14,15 21:7
21:11,19 24:23
25:1 47:11 48:9
48:12 62:16,16
**ensures** 28:3
**entered** 91:8
**entire** 19:15 31:22
83:18
**entirely** 28:14
**entitled** 30:25
31:2,4
**enumerated** 3:8
**envelope** 37:1
**envisioned** 71:25
**equal** 28:25 38:22
45:8 74:12 75:8
84:20 85:7,21
**equals** 74:22
**equation** 51:23
**equity** 43:13 44:20
44:22,24 45:5
74:10,10,20 75:6
83:23 84:18,20
85:3,6 86:24
**Esq** 4:4,8
**essentially** 17:22
27:17 39:22
85:17
**estate** 9:4,5 15:16
15:21 16:5,13,16
34:5,22 53:11
58:6,22 64:19
69:10 85:24
**estimated** 41:23
**eventually** 21:23
62:22
**everybody** 45:18
**evidence** 89:13
**evidenced** 32:16,19
**exactly** 20:3
**examined** 5:8
**example** 59:17
**excess** 42:16 44:10
46:12
**exchange** 28:2
**exclusively** 70:1
**executed** 20:12
**execution** 18:25
**exhibit** 2:3 3:2
9:15,18 11:7,19
11:21,24 12:5,6

---

12:10,13,15
13:21 15:7 30:10
30:11 41:6,12
50:1,5 57:19,21
57:24 58:24
60:20,21 63:4
65:8,9,12 67:5
67:11,15,20,24
68:4 78:10 79:18
79:22 80:1,3
81:16
**exhibits** 3:8 5:5
13:12 41:11
**existing** 29:19
72:10
**exists** 39:17
**exit** 16:23
**expect** 26:1 73:13
**expectation** 73:24
**expected** 25:22
74:13
**expense** 62:1,2
**expenses** 59:12
73:2 79:14
**experience** 12:4,11
12:16 25:2,3
**experiences** 9:12
**expert** 9:24 10:13
10:16,20,21 11:4
12:16,19,24 13:7
13:13,17,22 14:2
17:8 20:8 48:7
62:12
**expires** 92:21
**explain** 5:23 18:8
24:22
**explained** 15:8,12
**explaining** 77:22
**exponential** 74:10
**exposure** 84:19
**extend** 27:14
**extent** 26:21 32:11
32:21,21,23
33:23 35:3 59:13
74:11 85:16
**extraordinary**
43:10
**extreme** 27:15
**e-mail** 20:23
**e-mailed** 20:20

**F**

**F** 89:2
**face** 26:18 70:12
80:15
**facilitate** 58:19
**facing** 55:19,23,23
**fact** 9:24 11:3,5
43:9 44:24 63:17

64:18 69:10
80:14,17 81:17
**factor** 36:2,3 38:1
38:4,14 43:12
44:18,19 71:18
86:6
**facts** 17:25 29:14
29:14,17,18
68:24 69:1,25
70:18 71:5
**fail** 40:17 81:10
**fair** 5:24
**fairly** 18:20
**falls** 81:11
**familiar** 85:22
86:2
**far** 14:13 15:5
17:25 27:15
**fastest** 35:17
**FDIC** 13:18 14:2,5
15:13 16:3
**feasibility** 10:8
16:14 21:13 25:1
26:5 42:6 47:5,9
47:16,17 48:11
59:4 62:17 64:4
64:7,9,13,16
68:2,5,22 72:22
77:3,20 78:2
80:10,18,22
**feasible** 25:25
48:18 69:6,17
72:9 82:5
**feasibly** 81:4
**February** 2:8 23:6
**federal** 14:15
88:10 91:6
**fees** 27:5
**FERRIS** 4:4 20:22
21:2 30:9,13,17
30:22 32:11,23
33:23 34:9,15
36:9 39:23 40:5
41:1,8,13,18
55:3 60:23 67:16
68:23 70:20
75:18 78:18
79:20 82:17,22
87:19,22,25
**fiduciary** 9:1
**field** 44:12
**fifth** 13:17 54:19
**fifty** 21:18
**fifty-eight** 37:21
**figure** 27:18
**filed** 14:14 15:12
16:24 41:21 79:9
82:20
**filings** 22:7

**final** 71:11 83:12
**finance** 46:5,9
73:18 77:7
**financial** 8:24 9:1
19:4 23:22,23
47:25 50:9,12
58:20 66:4,10
70:13 71:6 72:20
72:20,22,24 73:5
76:21 78:2 80:21
80:24
**financially** 25:10
25:25 72:9,13
81:4
**financials** 35:10
52:24 70:4,7,15
70:19 77:13,17
**financing** 16:23
42:21 43:12,14
44:1,3,8,12,14
45:21,25 46:18
47:23 58:21,22
69:21 70:14
72:12 75:24 82:7
82:9,11,15 83:5
83:6,9,25
**find** 62:18,20 67:3
74:17 78:5 79:6
85:13
**finding** 67:6
**fine** 20:24 30:16
30:19,22 34:13
41:17 87:25
**finish** 6:6
**firm** 14:3,6,7,8
15:13,15,17 58:5
**firms** 15:20
**first** 5:8 7:10,14
11:2 14:1 19:25
24:17,17 27:24
32:3 35:8 36:14
40:1 57:4 59:6
59:14 67:17 71:9
77:8
**five** 10:25 13:12
13:21 14:16 25:3
29:12 32:17
37:21
**flew** 53:4
**floor** 59:18
**Florida** 1:1 4:6,10
23:14,15 34:25
53:12 54:23
57:17 58:2 64:23
**flow** 46:8 49:4
79:14 84:8,22
**flows** 26:18,20
45:2,22 46:7,19
85:1

**focused** 70:8
**follow** 17:16 32:2
**following** 73:20
90:5 91:5
**follows** 5:9
**foot** 59:19
**foregoing** 89:7,11
**forensic** 18:20
26:19
**forget** 63:4
**forgot** 63:1
**form** 36:10 43:24
61:11 68:23 91:7
91:9
**forma** 23:25 50:14
50:16 60:17 61:3
61:12 72:5 77:12
77:17 78:22 80:7
**formal** 65:2
**formally** 21:4
68:13
**Forman** 4:4
**formas** 24:11
**format** 79:11,12
**formerly** 7:10
**Fort** 20:9 54:21
**forth** 27:6
**forward** 44:6
**forwarded** 50:14
**found** 55:22 70:1,3
**four** 13:14 14:18
15:11 21:18
**frankly** 14:10
**frequently** 11:2
**Friday** 43:25
**front** 11:8 56:4,9
56:10 66:23 67:8
67:24
**FT** 1:2
**full** 10:25 27:12
28:4,15,22 32:21
**Fulton** 17:20 89:5
**functions** 18:17
**funded** 74:6
**funds** 44:22 74:21
86:25
**furnish** 92:15
**further** 39:1,13
40:20 87:17
89:13
**future** 2:22 28:24
45:7 79:9 84:22

**G**

**gamut** 19:15
**gather** 25:18
**gathers** 58:5
**Gaudet** 1:8 5:7,14
5:15 6:19 11:21

12:4,9,9 19:25
21:3 30:24 50:5
50:7 57:23 65:11
67:23 68:7 76:9
77:12 79:25
92:17
**GAUDET/RKC** 91:1
92:1
**general** 19:12
31:18,23
**generally** 47:10
55:25 73:9
**generate** 46:19,23
**generated** 71:19
**geographically**
6:11
**Georgia** 1:14 5:4
14:20 89:4 90:5
90:9,14 91:6
**germane** 80:21
**getting** 5:20
**give** 6:14 28:9
45:14,16,17,18
54:12 56:14
64:15 83:13
**given** 9:23 13:8
17:19 18:1 25:12
31:3 44:5 60:13
71:19 86:8,20
89:13 91:2,8
**gives** 37:18 50:25
**giving** 15:2 82:6
82:13
**GlassRatner** 6:21
6:24 7:6,9 8:23
**go** 11:1,18 15:7
19:2,22 21:2
22:13 30:7,13
37:15 46:3 50:4
53:21 55:7 59:12
59:25 60:11
61:18 62:25 63:9
63:16 67:4,16
69:12,24 72:3
73:12 79:17
80:19 87:24
**goes** 32:18 37:12
38:4 47:16 48:13
**going** 5:17,23
10:24,25 14:1
15:12,19 16:22
27:17,18 29:18
29:21 30:15
33:15 34:9 37:13
40:10,15,19,22
41:14 42:7,23
43:21 44:20 45:3
45:17 46:5,9,10
46:15,19,22 50:7

58:13 60:6,8,10
60:25 61:23
71:24 73:11,25
74:17 76:7 77:24
81:2 85:6 87:6
88:4
**good** 60:15
**gotten** 22:12 57:6
62:15
**grab** 37:11
**grace** 69:9
**grand** 36:1 39:10
46:23
**granted** 33:18
**granular** 62:5
**grass** 56:1
**Great** 8:11
**greater** 28:25
59:15
**greatly** 15:25
**gross** 61:15 79:12
**grossly** 29:24
**groundwork** 53:5,8
53:13
**group** 6:21,22,23
17:18
**guarantor** 23:23
**guess** 10:2 13:15
13:15 20:2 31:18
42:20 60:3 70:24
79:7 85:15,16
**guy** 87:4
**guys** 46:14
**G-a-u-d-e-t** 5:14

**H**

**haircut** 71:23
**hand** 46:16
**handy** 9:14
**hang** 49:8 79:5
**happen** 33:4
**happened** 17:16
20:9 31:25
**happy** 78:4
**hard** 8:8
**head** 6:17
**hear** 31:1 49:14
54:5
**heard** 20:1,6
**hearing** 8:9 24:17
28:5 66:18 89:13
**heavily** 70:5 71:11
**heck** 74:19
**held** 18:10,14
**help** 36:6
**Hibernia** 7:22
**high** 43:12
**higher** 43:22 44:15
44:16 75:25

77:23 86:24
**highest** 82:6
**high-end** 16:12
**historic** 25:18
**historically** 9:4
**hit** 26:10 81:6
**hold** 8:14 49:11
**Holdings** 10:6 13:5
16:10
**home** 69:12
**homeowner** 14:24
**honestly** 35:17
**hopefully** 11:8
**hourly** 21:15,17
**hours** 62:23
**hundred** 69:13
73:13,17 77:23
77:23 84:19
85:18,19 87:5
**hundred-percent**
83:24 85:11,24
86:3 87:2

**I**

**idea** 40:9
**identification** 5:6
9:16 12:14 50:2
57:22 60:22
65:10 67:12,21
79:23
**ignore** 72:10
**immaterial** 69:3
**immediate** 43:2,2
**impact** 64:13
**impacts** 77:3
**important** 40:7
**importantly** 74:11
**incapable** 49:2
**include** 23:3
**included** 42:23
**includes** 12:18
23:20
**income** 25:21 34:4
61:2,3,22,23
73:2 79:11,13
84:18
**incoming** 34:7
**inconsistently**
22:1
**incorporating**
64:18
**incorrect** 18:2
**increase** 74:5,5
**increased** 61:24
**increases** 61:22,23
**increasing** 62:1
**indebtedness** 32:9
32:10,14,15,16
32:19

**independently** 71:8
**indicated** 63:5
77:16 78:12,21
**indicates** 35:2
**industrial** 9:5
**industry** 9:4 61:13
77:7
**infeasible** 69:8,19
69:22 72:13 82:1
82:3,4
**information** 18:2
21:25 22:4,6
23:17 25:18,19
58:7 68:14,15
**initial** 40:17
71:10
**Initially** 58:11,12
**input** 57:9
**inspect** 25:17
**inspection** 66:20
67:9
**intend** 83:13
**Interchange** 54:22
**interest** 27:6
34:23 37:18,19
38:14 43:16
73:19 74:2 82:16
83:7,20,22 84:3
84:7,17 85:2,6
85:10 86:5,7,13
87:15 90:7
**interested** 89:17
**interpret** 27:16
**interrupt** 34:16
**interspersed** 54:22
**interview** 52:8,10
**invalid** 78:3
**inventory** 64:22
65:5
**investigation**
26:20
**investment** 17:18
17:21 32:6 44:21
72:25 73:1,4,6,8
73:12 74:7 75:5
76:18 77:5 82:13
83:22 85:4 86:16
86:20
**investor** 45:3 75:5
75:6 86:17,19
**investor's** 45:1
**involves** 19:12
**issue** 10:7 27:23
72:8 77:25
**issues** 34:4,7
51:25
**i.e** 15:23

**J**

Jackson 4:12
JACQUELINE 4:4
January 12:10
Judicial 5:3 90:5
July 2:13
June 2:12 7:17,18
22:21
justify 69:14

**K**

K 1:15 89:21 90:17
91:3
keep 39:24 41:16
62:18,19
Kendrick 4:9
Kennedy 4:10
key 19:10
kin 89:14
kind 21:25
knew 65:22
knocking 46:25
know 6:2,8 14:13
17:15 20:3 26:21
29:3,9 31:20
32:4,9,22 33:4
33:11 34:14 36:3
40:12 41:9 42:1
42:3 46:20 48:4
52:4,6 54:22
55:2,6 59:6,10
59:25 61:8,21,25
62:15 63:17
64:10 65:13,15
65:17 66:15,17
66:19 70:4 71:21
75:19 76:6 78:17
80:8,16,24 85:12
87:14 88:4
knowing 42:5
knowledge 22:5
34:14 57:10

**L**

lack 64:14
landscaping 55:25
language 32:2 35:1
large 18:20 26:21
60:5 65:4
larger 44:9
late 10:2
latest 27:14
law 14:3,6,7,8
15:13,14,17,20
90:14
lawsuit 14:9 17:21
lawsuits 13:15
lawyers 65:19
lawyer's 15:24
lay 10:15 33:21

learn 77:4
lease 23:18 59:7,8
59:10 62:8,13
63:8,15,22,23
64:1 79:12
leases 23:19 25:19
52:2,5,7 61:19
62:8 63:6,7,10
63:11,12,13,14
63:18,22 64:1,11
64:12
lease-up 58:15,16
leave 44:13,13
71:17
ledger 19:13 23:24
Lee 34:25 53:24
legal 32:12,24
33:24 34:10
41:15 90:12
lender 16:21,22,23
17:1,22,23,24,25
22:16 23:25 26:1
26:4,8 27:25
28:1,10,13 33:19
45:3 54:7 73:9
74:17 75:6,7
84:20
lenders 17:22 48:1
lender's 75:7
lending 16:5 48:8
lending-related
16:2
letter 20:13,14,15
21:7 47:11 62:16
let's 11:17,18,18
13:20 15:7 19:22
27:22 30:1,7
44:24 45:10,12
48:22 50:19
52:18 57:19 63:4
65:7 67:3 73:17
79:17
level 44:11 45:21
62:5 87:3
levels 62:2
leverage 74:4
86:23,24
liable 32:4,9,19
35:2
license 8:15,16
licenses 8:14,17
lieu 28:13
life 84:9
likewise 25:13
limited 35:6
Line 91:11,12,14
91:15,17,18,20
91:21,23,24 92:2
92:3,5,6,8,9,11

92:12
liquidating 10:3
liquidation 42:16
42:24,25 44:6
47:14 51:25 52:1
69:23
listed 13:16
listing 12:15
literally 58:25
little 69:4
LLC 1:5
LLP 4:4 32:7
loan 16:6,12 17:3
18:1,1 22:3,10
22:16 23:2 25:20
26:1 32:20 33:19
34:2 35:4 44:23
44:25,25,25 49:6
51:14 85:5,10,12
85:13,17 86:7,8
86:13 87:5
loans 15:23,25
17:5 47:25 85:22
85:25 86:2 87:1
87:12
locate 78:25
located 34:22,24
54:16
location 78:17
logical 6:7
long 7:6,14 30:15
52:19 75:2
look 11:21 20:16
25:24 26:7 30:7
30:25 33:1,7
43:15 47:10,12
50:19 51:4 53:21
55:7,12,14,14
56:2,17,19,23
59:13,18 60:17
61:2,2 63:9 73:7
78:7 80:1,19
81:19 83:2
looked 22:13 26:23
27:1,8,10,11,13
35:10,19 36:18
36:21 78:5
looking 15:14 26:5
46:21 50:12,13
51:2 53:6 61:25
67:7 79:2,18
80:16
looks 12:18 34:4
59:13
Loop 4:9
lose 46:10
lot 20:10 39:2
56:1,3,5,17
58:12,19 61:23

Louisiana 8:1,7,10
lower 35:24 40:16
40:19,22 73:11
73:12 77:24 81:6
81:9
lowering 81:5
L.L.C 5:16 6:23
32:6

**M**

majored 77:7
majority 25:2
making 28:19,20
29:20 49:2 61:19
71:15 91:8
management 52:10
53:11 57:2
management's 19:3
manager 7:12
manufacturing
19:14
March 2:9
margin 73:10,10
margins 80:17
mark 9:17 11:18
12:5,10 41:8
50:4 57:19 60:19
65:7 67:3,4
79:17
marked 5:5 9:15
11:7 12:6,8,9,12
12:13 13:12
41:11 50:1 57:21
60:19,21 65:9
67:11,18,20
79:22
market 22:23 23:13
23:14,15,16 26:9
38:2 46:4,4
47:22 48:18,19
53:9,12,13 54:11
60:15 63:8,23
64:2,12,13 75:23
75:23,25 76:1,4
76:7,10,14 82:8
82:10 85:10 86:7
marketplace 47:25
48:8
master 23:18
material 80:18
math 37:10,14
40:21 59:8 85:7
86:14,15
mathematically
75:7 82:12
mathematics 44:4
73:2
matter 9:25 13:3,3
13:5,16 14:2,19

15:2,8,13  16:3
20:9
**matters** 13:9  18:22
75:20  76:6
**maximizes** 64:19
**mean** 7:4  16:6  18:8
19:14  29:9  48:17
50:19  51:4  53:8
53:16  58:25
59:24  60:10  66:9
74:24  77:6  80:15
**meet** 25:8,14  29:25
59:9  65:3
**mentioned** 26:25
59:9  65:3
**method** 75:13
**methodologies**
27:23  72:15,21
**methods** 70:18  71:4
**metrics** 58:20
**mezzanine** 85:17
**microphone** 28:6
**mid** 20:2
**MIDDLE** 1:1
**midyear** 2:20  58:3
**mildew** 56:5
**military** 8:3
**million** 22:19,24
27:5,7  29:23
31:5  36:24,25
37:13,17  38:9,12
39:8,15,17  41:24
42:4,7  43:1,2
45:12,13,20,23
46:15,25  47:20
47:21,21  48:23
49:3,6,9  51:11
68:18  69:13
76:17,17  81:24
83:14,14,15  84:5
84:13,15,16
**mind** 41:9  54:1
69:7
**minus** 73:2
**minute** 63:5
**minutes** 52:20
**misled** 17:25
**missed** 28:11
**missing** 51:23
68:15
**mitigated** 15:25
**mitigation** 15:23
**mix** 55:17
**modification** 40:8
**modifications** 23:4
63:18,20
**moment** 42:22
**money** 26:1  38:5,21
39:2  45:22  46:11
74:12  85:19

86:23
**month** 20:12  21:4
29:20  30:3,4
35:16  36:15
46:23  79:15
**monthly** 2:8,9,10
2:11,12,13,14,15
23:5  35:9,11
38:15  49:5  50:8
50:10  51:18
57:11
**months** 38:17  85:23
**moot** 81:20,21
**morning** 43:24
50:14  57:4,16
60:24
**mortgage** 33:5  34:5
69:12
**mortgaged** 34:8,20
**motion** 23:9
**motions** 41:20
**move** 28:6  74:22
77:24
**moving** 26:14
**multiply** 37:23
38:17
**Myers** 1:2  20:9
54:21

**N**
**nail** 83:12
**nailed** 81:17
**name** 5:12,15  10:4
20:1,6  54:4,17
**Naples** 54:4,18,19
**National** 7:22
**nature** 5:1
**near** 54:21
**necessarily** 40:12
48:4  55:7
**necessary** 64:11
72:7  92:14
**need** 6:8  27:9
39:12  48:19
58:13  67:17
73:14  74:1,4,19
80:10  83:2
**needed** 35:9  83:21
**negotiations** 52:6
**neighborhood** 13:18
13:18
**net** 28:24  29:4
40:11  71:25  81:2
**never** 18:7  19:19
37:4  46:10
**new** 44:1
**newspaper** 43:25
**nice** 87:4
**nine** 83:15

**nod** 6:17
**NOI** 25:22,22
**nonconventional**
60:5  61:12
**nonrecourse** 28:1
44:8  45:21  46:6
46:9,18  47:23
72:12  75:24
82:11  85:12,24
86:3  87:2,11
**nonverbal** 6:16
**non-bank** 17:1
**Nope** 68:6
**normally** 37:25
**north** 1:5  4:7  5:16
20:1  27:6  32:6
34:24  53:15,19
53:22  56:20  57:2
58:10  59:23
60:17  62:13  79:8
**Notary** 92:20
**notch** 81:6
**note** 2:19  13:1
30:6,8,25  31:4
31:16,22  32:5,15
32:16,18  33:3,5
33:7,8  50:5
**notebook** 78:8,9,10
**noted** 91:4,5
**notes** 23:3  59:18
77:10  80:16
87:20
**notional** 29:23
35:25,25  36:24
51:24  72:11
**November** 1:10  3:5
50:20  89:18
90:18  91:3
**number** 27:19  36:22
37:23  38:4  45:13
49:15  51:10
61:15  68:16  69:6
71:11,22,22
77:24  81:18,21
81:22,24  83:12
86:9
**numbers** 36:18,21
58:16  59:12
61:20
**numerous** 63:18

**O**
**object** 34:9
**objection** 2:6
32:11,23  33:23
34:11,18  36:10
41:14  55:3  57:1
68:23  75:18  88:6
**obligation** 50:8

**obligations** 32:20
**obtained** 23:18
**obviously** 19:10
55:19
**occasionally** 8:25
18:21
**occupancy** 58:7
**October** 24:18,18
40:8  46:20  50:20
52:15  66:18
82:21
**offer** 75:22
**offhand** 54:14
**office** 6:24  60:8
**officer** 19:1,19
**Official** 91:6
**offset** 62:1
**Oh** 61:10
**okay** 6:8,9,17  8:11
11:20  16:2  19:5
23:1  28:21  31:11
31:24  32:8  37:12
37:22  38:23  39:7
39:9  40:5  41:18
41:25  42:13,18
45:24  46:14,17
47:18  48:16
49:20  51:6  56:19
61:4,10  68:17
80:4  82:22  83:1
85:14  88:8
**old** 65:19  68:18
78:16
**Omega** 8:4
**once** 43:3  62:20
85:20
**ones** 29:11
**open** 12:23  13:2,4
75:23
**operated** 19:17
**operating** 2:8,9,10
2:11,12,13,14,15
2:21,22  19:13
22:3,9  23:5,10
25:19  50:14,16
57:11  60:17
70:16  71:7,12
79:9  80:20
**opinion** 54:25  60:1
68:9,22  75:16
76:4,10,12,14,16
76:23  77:1  85:9
86:5
**opinions** 53:18
66:13
**opportunity** 72:4
**opposed** 31:21
**opt** 44:2
**option** 28:19  44:5

46:3
**oral** 58:24 68:22
**Orange** 4:5
**order** 51:13
**original** 3:8, 8
15:25 21:24 22:8
36:23 37:16
38:10, 11 42:23
58:17 72:6 77:13
77:18 78:13, 19
79:3
**originally** 22:1
38:7 48:11
**Orlando** 4:6
**Osborne** 13:3, 16
14:19 15:2, 7, 8
**ought** 45:25 61:7
86:6
**outcome** 55:6
**outside** 9:23 25:9
26:7
**overall** 55:15
**owed** 35:4
**owner** 14:24
**O.C.G.A** 88:11 90:7

**P**

**page** 2:3 3:2 12:3
13:16 67:8 79:9
91:11, 12, 14, 15
91:17, 18, 20, 21
91:23, 24 92:2, 3
92:5, 6, 8, 9, 11, 12
**pages** 89:11 92:14
**paid** 19:17 21:15
27:12 28:4, 22
42:7 48:24 78:1
**paper** 11:8
**Paragraph** 33:6, 13
**parking** 56:1
**Parks** 9:25 10:15
**part** 15:6 27:1
31:1 48:12 61:3
79:7 83:5 91:7
**participating** 6:10
**particularly** 82:9
**parties** 89:15, 16
**pass** 38:25 59:14
**path** 26:15
**pay** 35:16 36:15
43:6 46:15, 17, 25
48:21, 25 51:14
69:15 73:16 74:2
75:25 76:2
**payable** 19:18
**paydown** 51:7
**payment** 23:24
28:15 30:5 35:24
37:19 40:14, 15

**payments** 28:24
29:20 30:2 35:9
35:11 36:1, 20
37:24 39:11 45:7
49:2, 5 50:17, 25
59:7, 8 71:15
**Peachtree** 1:13
**pending** 6:4, 6 9:21
13:3 14:12 49:18
49:19
**percent** 43:14 45:1
45:1, 4 46:6, 6, 6
48:24 49:6 61:14
73:18, 24, 25 74:3
74:4, 4, 6, 18, 23
75:7, 24 83:21
84:2, 19 85:18, 19
86:6 87:5
**perform** 26:24
38:23 39:1, 18
51:18, 20, 21 81:4
**performance** 80:21
80:24
**performed** 18:17
24:5 39:4 40:3, 4
**period** 29:2, 4
61:22
**periods** 23:6
**permutations** 35:22
35:23
**perspective** 26:8
27:11, 13 72:14
77:20
**pick** 43:25
**picked** 59:6
**piece** 51:23 69:9
**pilot's** 8:16
**place** 52:7 71:17
**plan** 2:5, 7 10:8
16:14, 17, 18, 18
16:19 17:15
21:12, 24 22:1, 8
25:14 26:7, 11, 15
27:14, 16 28:3, 15
28:23 29:10, 11
29:19 36:23
37:16, 24 38:6, 11
38:11, 12, 20
39:24, 25 40:1, 2
40:9, 15, 20, 24
41:1, 6, 20 42:15
42:22, 23 43:4, 12
43:15 44:15
48:18, 21 51:22
58:18 64:14, 18
69:1, 2, 5, 6, 8, 16

69:17, 18, 22 70:1
70:3, 5, 13, 19, 20
70:22 71:9, 21, 25
72:6, 8, 12, 13, 22
72:23 77:3, 21
80:11, 18, 23 81:3
81:8, 9, 11, 25
82:7, 8, 15, 17, 19
82:20 83:2, 10
84:2, 4, 9
**plans** 25:4 39:24
40:1 41:9 70:25
71:1, 5, 5
**playing** 44:12
**please** 5:12, 20
22:14 41:2 56:25
91:9 92:15
**pledged** 33:18 34:2
**Plus** 74:2
**pocket** 46:11, 24
**point** 5:18 6:1
21:21 34:12
41:21 48:14
58:18 64:5 72:9
74:22 77:11
**policies** 16:1, 4
**portfolio** 53:11
54:10 65:4
**position** 7:2, 11
35:12 44:11 49:1
50:11 66:4, 6
**positions** 66:7
**possession** 17:4
66:16
**possible** 25:17
82:6
**practice** 9:1 18:21
18:22 19:9
**practices** 15:5, 9
18:4
**predated** 65:22
**predecessors** 7:16
7:23
**premium** 44:10
**preparation** 57:9
**preparatory** 14:14
**prepare** 26:2 68:11
68:17
**prepared** 12:1
24:20 45:14, 16
47:24 61:13 65:2
66:21 68:8
**present** 4:11 26:4
28:24 29:5 90:10
**presently** 6:19
**presumably** 18:1
61:23 71:24
**pretty** 54:10
**price** 43:22, 22

44:2, 9 75:25
**primarily** 8:24 9:3
22:6 68:13 69:1
70:9
**prime** 87:14
**principal** 7:3 28:4
29:23 37:4, 9, 19
38:6 40:11, 22
51:7 72:1 74:24
81:2
**principle** 70:17
73:1
**principles** 71:4
72:15, 20, 24
**prior** 7:8, 18, 21
18:25 19:3 24:17
31:25 42:4
**pro** 23:25 24:11
50:14, 16 60:17
61:3, 12 72:5
77:12, 17 78:22
80:7
**probably** 14:15, 23
20:3 21:21 52:20
70:4
**Procedure** 88:11
91:6
**procedures** 16:1, 5
18:4 19:13, 14
**process** 43:3 62:18
83:19
**produced** 39:22
57:15 65:18
**product** 43:20
**professional** 8:17
**profits** 34:5, 7
**prohibited** 90:14
**project** 25:17 62:3
83:24
**projections** 80:21
**projects** 18:21
54:2, 6
**Promenade** 54:1, 15
54:17
**promissory** 2:19
23:3 30:25 31:4
31:16 32:5 50:4
**properly** 26:8
76:22
**properties** 53:14
53:17, 20, 24
54:13, 25 55:5, 13
56:13, 15, 18, 20
59:23 64:22
**property** 3:3, 4
23:10 25:18, 22
26:24 27:2 33:17
34:6, 6, 8, 20 36:8
36:19 38:3 42:1

42:25 43:5,5,9
43:11,23 44:9,17
45:15,19,20 46:1
46:4,5,12 47:2,3
47:20 48:22
52:12,14,23,25
53:15,22 54:15
55:6,7,9,15,16
55:22 56:10,12
56:16,21 59:11
59:23 60:4,5
61:14 62:14 65:7
65:16,22 66:11
69:3,9,10,13
71:12 73:10,13
73:15,16,17
74:16 76:4,11,15
80:13 84:8 85:21
86:4
**proposal** 26:3,23
**proposed** 16:11
27:14 38:7 40:15
43:4 48:17,24
51:22 80:23
82:15,24 86:8
**proposes** 48:21,25
**proposing** 17:3
**propounded** 91:2
**provide** 14:2 15:19
16:22 20:8 21:12
42:16 47:5,8,13
47:24 48:3,6
82:5 86:6 90:12
**provided** 10:16,20
11:1 16:13 22:6
23:11 28:14
29:12 71:13 79:5
**provides** 28:15
79:11,13,14
**providing** 15:22
83:24
**provision** 31:12,14
31:20
**provisions** 31:21
33:8 90:7
**prudent** 48:15
86:17,19
**Public** 92:20
**purpose** 52:21
**purposes** 53:22
61:16
**pursuant** 5:1 88:10
90:4 91:6
**put** 42:21 44:5,7
45:21 46:24 47:2
47:22 75:21 80:2
81:20 83:10
85:18 86:23
**puts** 85:2

**putting** 46:10 82:8
**p.m** 19:23 30:23,23
49:24,24 67:19
67:19 79:24,24
87:23,23 88:9

---

**Q**

**qualified** 78:1
**qualify** 17:14
85:16
**quality** 19:3
**quarterly** 58:6
**question** 5:19,21
5:23 36:10 39:10
39:25 49:18,19
59:5 63:6 69:24
71:2 72:4,5,19
76:24 81:1,13
82:23 83:8 87:10
**questioning** 6:7
**questions** 5:18 6:4
6:6,14 20:21
76:10 87:18 88:1
89:9 91:2
**quick** 37:15 59:8
**quickest** 36:16
**quite** 48:5

---

**R**

**R** 89:2
**raise** 46:16
**raised** 17:10
**ran** 37:2
**range** 73:10
**rate** 21:17 37:18
43:9,10,16,18
44:19,19,22,25
45:1,6,8,25
48:25 59:10 60:6
61:6 63:8 64:12
64:13 74:23,25
75:1,3,4,8,8,10
75:16,20,22 82:8
82:24 83:20,22
84:3,7,7,20,21
84:21,23 85:2,5
85:6,7,10,21
86:7,10,12,13,17
86:19,25 87:14
**rates** 38:2 48:1
58:7 59:22 60:2
60:15 62:8,13
63:15,22,23 64:1
**read** 31:14,16,17
31:17,20,22 32:1
33:3,9,12 57:5
63:12,13 66:1
71:1 88:2,7 91:2
91:7,11,12,14,15

91:17,18,20,21
91:23,24 92:2,3
92:5,6,8,9,11,12
**reading** 35:1 88:3
**Ready** 87:24
**real** 9:3,5 15:16
15:21 16:5,13,15
34:5,22 37:15
53:11 58:6,22
69:10 71:22
85:24
**realize** 35:10
**really** 38:25 39:12
41:16 58:18 59:1
70:11 72:6,17
**reamortize** 29:22
71:16
**reason** 29:4 39:1,3
56:22 62:19
63:20 70:10
76:24 77:17,20
**reasonable** 15:20
25:25 26:9
**reasonably** 25:11
**reasons** 91:8
**recalculate** 83:18
**recall** 14:11 47:6
77:6
**receive** 24:11
**received** 10:21
20:7 22:10 24:10
24:13,15,19
**receivership** 9:1
**Recess** 19:23 30:23
49:24 67:19
79:24 87:23
**recognize** 11:22
**recollection** 17:12
**record** 5:13 11:11
11:12,18 19:22
19:24 20:25 21:1
30:13 50:4 66:8
67:17,22
**recourse** 43:16
**recover** 37:4 39:6
43:5
**recovery** 37:24
42:16
**reduce** 71:25
**reduced** 89:10
**reduction** 40:21,25
41:23
**refer** 78:19
**reference** 41:22
**referred** 33:19
72:2
**referring** 12:7
39:25 40:1 41:5
66:6 70:21,23

78:11,25 82:18
**refill** 49:21
**refinancing** 84:3
**reflect** 52:5
**regard** 39:19
**Regency-Brentano**
90:10,11
**regional** 7:12
**regular** 53:20
89:15
**Regulations** 5:2
90:4
**reimburse** 17:23
**reimbursement**
59:11 61:14,15
61:24 62:1,2
**relate** 52:22 53:19
**related** 14:18,19
15:4 18:3 42:11
61:24
**relates** 15:16
45:24 46:2 53:18
**relating** 16:5
**relationship** 90:7
**relative** 64:19
69:22 70:14
72:14
**relatively** 43:15
77:1
**relied** 60:13 68:25
69:25 70:1 71:10
**rely** 29:15 59:20
70:15
**relying** 18:1
**remains** 75:21
**remember** 21:4,6
54:4 77:14
**remind** 16:9 73:3
**Renda** 1:15 89:21
90:17 91:3
**render** 58:24
**rendered** 54:25
**rendering** 66:4
**Renewal** 31:4
**rent** 23:24 25:19
59:18 61:14,15
62:4
**rental** 58:7 59:10
59:22 60:6 61:6
**rents** 34:4,7 61:14
**Reorganization** 2:5
2:7
**report** 2:8,9,10,11
2:12,13,14,15,20
3:5,6 10:20 22:3
22:9 23:11,13,15
24:20 57:12,16
58:2,4,9,17
59:21,25 65:3,22

66:12 67:1, 4, 14
67:24 68:1, 4, 8
68:17
**reporter** 5:1 6:12
6:15 90:2, 9
**reporting** 5:3 90:4
90:12
**reports** 23:6, 24
58:6 66:21, 25
70:16 71:7
**represent** 5:16
89:11
**representative**
90:10
**represented** 16:20
16:21
**representing** 11:16
14:4 15:18
**request** 26:9
**required** 11:15
19:2 43:4 62:22
64:4
**requirements** 25:9
25:14 26:10
**requires** 18:24
**reserve** 81:17
**reserved** 88:13
**resetting** 35:24
**resident** 6:25
**residential** 16:13
**respect** 24:24 48:8
55:12
**responses** 6:16
**rest** 28:12 55:23
**restate** 5:21, 23
**restating** 41:16
**restaurant** 60:9
**restaurants** 54:20
**restriction** 29:3
**restructure** 25:6
**restructures** 54:8
**restructuring** 8:25
9:2, 3 19:1, 19
25:7
**result** 39:22 89:17
**resume** 29:20
**retail** 2:20 23:13
54:19, 20 55:19
57:16 58:2, 4
60:6, 8, 10 61:1
**retained** 13:13
15:13 47:5, 8, 13
**retention** 24:24
58:10
**retentions** 13:13
13:22 14:17
**return** 44:22 73:12
73:14, 24 74:1, 3
74:10, 13, 20, 20

75:5, 6, 8 81:12
82:6 83:7 85:4
85:19 86:18, 20
86:22, 24
**returns** 73:8
**revalue** 41:20
**review** 19:12, 13
22:11 54:24
59:25 68:1 72:5
77:10 87:20
**reviewed** 55:4
57:12 59:9 62:9
62:24 63:5, 10
71:7
**reviewing** 52:23, 24
**Richard** 1:8 5:7, 14
12:4 91:1 92:1
92:17
**right** 15:9 21:18
28:1, 11 46:7
49:10 51:1 59:13
59:14
**risk** 43:6, 9, 10, 12
43:13, 17, 19, 21
44:20 46:24 73:9
73:11 74:18
75:24 84:20
86:21
**RMA** 8:4, 4, 5
**Robb** 55:23 56:4
59:6, 7
**rolled** 23:3 61:13
**rolls** 23:24 25:19
**roughly** 27:4 39:17
49:8
**round** 45:12
**RPR** 1:15
**Rule** 88:10 91:6
**Rules** 5:2 88:11
90:4 91:6
**run** 37:14, 15 39:21
81:6
**running** 19:15
56:11

—————————
**S**
—————————
**safe** 40:14
**sake** 48:22 70:8
**sale** 64:23 65:5
**Savannah** 9:21 10:4
10:10, 14 12:20
13:5
**saves** 39:1
**saw** 57:4 77:8
**saying** 10:18 13:21
50:9 69:16
**says** 32:8 81:8
84:25 86:14, 15
**scattered** 21:25

**scenario** 26:6
44:23 74:15, 21
84:24
**scenarios** 83:16, 17
**scope** 21:10 24:22
**second** 2:5, 6 11:17
14:16 22:18
30:14 49:9, 12
51:2 59:18 60:7
67:17, 18 71:15
71:21 75:15 79:7
82:20 84:1
**seconded** 23:8
**Secondly** 58:17
**Section** 31:9 32:3
35:1 90:8
**secured** 10:11
16:24, 25 28:14
28:22
**Securities** 67:1, 2
**security** 33:17, 18
34:6, 6
**see** 27:1 30:17
31:7, 12 43:25
67:9 81:14
**seen** 42:24 52:24
57:3, 24 65:11, 20
**selected** 84:24
**sell** 16:15 45:23
47:20, 23 73:15
74:16
**send** 56:11
**senior** 16:21, 22, 23
73:9
**sense** 46:3 48:14
59:8 70:11
**sent** 20:23
**separate** 66:25
**September** 2:16 7:7
21:8 23:7, 7 31:5
57:13, 14 65:23
67:4
**series** 5:17 7:23
23:3 64:8
**service** 25:23, 23
27:2, 18 46:20
50:21 71:20
79:15, 16
**serviced** 27:9
**services** 90:12
**set** 19:17 29:18
60:6, 9 74:25, 25
76:7
**sets** 29:17
**share** 78:4
**shared** 66:7, 9
**shareholder** 7:4
**short** 20:22 29:21
29:24 30:3, 9

79:20 87:19
**shoulders** 6:17
**showing** 66:25
**shrubs** 56:4
**shrug** 6:16
**Shumaker** 4:9
**shut** 14:5
**side** 25:4 56:9
80:2, 3
**signature** 88:12
**signed** 19:20
**significant** 18:6
19:11
**similar** 59:23
**simple** 43:24 44:4
71:18 72:3
**single** 12:3
**sir** 24:4 34:20
87:7
**sit** 47:19 69:8
**site** 53:5 66:20
**sitting** 80:12
**situation** 25:12
**six** 11:13 85:23
**sixty-one** 49:11
**sold** 43:1
**Solutions** 3:3
65:17
**somebody** 46:15
75:25 76:2 85:2
**somewhat** 61:12
69:3
**sorry** 7:21 8:8
28:5 37:17, 20
41:19 51:9 54:5
62:25 63:16
65:21 87:9
**sort** 6:10 26:19
35:14 56:12 59:5
62:5, 7, 12
**South** 4:5 34:24
**southwest** 23:15
53:12 54:23
57:17 58:2 64:22
**space** 60:9, 10
**spaces** 61:1
**special** 7:12
**specific** 60:11, 16
83:13
**specifically** 21:6
47:15 53:21
56:22 68:22
**specify** 48:9 60:3
**spell** 5:12
**spending** 20:10
**spent** 58:19
**Springs** 34:25 54:9
**stacked** 38:20
**stage** 14:15 26:16

**stand** 10:19
**standing** 34:11,18
  41:14
**start** 25:16 45:10
  46:10 52:19
  59:14
**started** 26:15 57:7
**starting** 13:11
  35:7 59:18 80:25
**starts** 79:10
**state** 5:12 8:1,7
  8:10 9:21 12:19
  14:21 15:12
  17:20 89:4
**stated** 30:5 89:8
**statement** 2:4,21
  22:2,9 23:8
  50:15,17 60:18
  77:14,18 78:13
  91:8
**statements** 19:4
  23:23,23 38:15
  50:9,13 58:24
  71:6,12
**States** 1:1 7:20
**stating** 45:19
**status** 47:25 48:7
**stay** 43:5
**stenographically**
  6:13
**step** 11:17 30:1
  38:3,16 62:3,18
  64:9,10,10 82:14
  82:14
**steps** 62:18 63:21
  64:8
**Steve** 5:15 34:9
  41:13 60:23
  67:16 79:20
**STEVEN** 4:8
**stipulated** 38:11
  45:18 70:10 71:9
  76:16
**stipulation** 10:22
  26:22
**stop** 5:20 22:18
  39:13
**stopping** 77:11
**stores** 55:18
**storm** 56:3
**straight** 25:16
**straightforward**
  42:20
**street** 1:13,13
  54:19 55:20
**strictly** 14:14
  22:5
**strike** 55:21
**structural** 72:14

**structure** 78:3
**structured** 81:3
**Stucky** 55:23 56:5
  59:7,7
**stupid** 38:24 48:13
**styled** 50:15
**subject** 14:8 51:25
**submits** 58:6
**subscribed** 92:18
**subsequent** 22:4
  23:4 42:24 78:24
**subsequently** 14:5
**substance** 16:9
  17:19 91:7
**successful** 64:17
**Suite** 1:13 4:5,9
**suits** 14:23
**sum** 36:1
**supervised** 19:18
**supplemental** 23:9
  92:14
**supporting** 26:3
**sure** 5:20 21:18,20
  36:11 72:18 77:8
  80:5 83:8 87:4
  87:21
**survey** 23:13
**swept** 56:2
**sworn** 5:8 92:18

**T**

**T** 89:2,2
**tab** 30:12 56:23
  78:7,18
**table** 2:1 3:1 28:8
  82:20 84:4
**tail** 58:21 69:19
**take** 6:1,2,5,7,15
  13:20 20:17,22
  27:16,22 30:1,7
  30:9,20,24 35:21
  43:21 44:2,12
  45:5 46:8 50:19
  51:6,9 56:23
  61:9 66:3 69:17
  74:7,19 79:20
  80:1 82:14 84:1
  84:25 87:19
**taken** 17:24 26:18
  27:15 63:21
  66:12 80:15 89:8
  91:3
**takeout** 17:25
**takes** 29:5 47:17
  64:8
**talk** 30:16,20 53:1
  61:1 76:19
**talked** 77:12
**talking** 9:13 41:4

  41:10 50:5
**Tamiami** 34:24 54:3
  54:6,18 55:23
**Tampa** 4:10
**target** 26:15 74:3
**tax** 59:11 61:15
  80:13
**tear** 69:11
**teleconference** 4:4
  4:8
**telephonically**
  6:12
**tell** 11:22 13:11
  33:2 37:14 42:18
  47:19 49:5 53:21
  61:6 69:8,16
  73:22 77:23 84:2
  84:6 85:15
**telling** 47:21
**tells** 86:17
**ten** 49:11
**tenant** 23:19 55:17
  79:13
**tenants** 52:8 61:6
  61:7
**term** 32:14 33:1,15
  40:11
**terms** 21:14 25:23
  25:24 26:1,10,23
  26:24 33:21
  48:18 51:22
  69:21 82:7 86:8
**test** 29:25 38:24
  39:5 40:17 48:13
  59:4,12,16 61:21
**tested** 80:13
**testified** 5:9 9:6
  9:8,19,24 10:5
  11:2 12:19,23
  13:4 36:13 47:4
**testify** 10:7,9
  48:10,10
**testifying** 14:7
**testimony** 2:18
  9:12,23 10:13,14
  10:16 11:15 12:4
  12:10,11,16 13:9
  14:2 15:2,19,22
  16:10,13 17:19
  18:3 20:8 21:12
  45:14,16,17,19
  45:24 46:2 47:5
  47:6,9,9,14,24
  48:3,7 54:5
  77:14 78:2 80:2
**Thank** 30:22 33:21
  87:22
**theory** 58:18 73:4
  73:5,6 74:8

  75:21 76:18,19
  76:21,21 77:5
  85:4 86:16
**thereof** 64:14
**thereto** 89:9
**thing** 6:3 55:14,21
  56:7 69:9
**things** 24:16 25:20
  26:2 58:12 61:21
  80:15
**think** 7:7 9:20
  17:5 27:14 29:9
  29:16 36:25 40:6
  40:14,18 45:17
  47:16 51:20,22
  55:4,21 56:16
  60:14 62:15 63:9
  63:10 66:9 70:3
  71:10 75:12,13
  76:25 77:2 78:3
  80:20 81:19 82:4
  86:12
**third** 2:4 78:18,20
**third-story** 60:7
**thirty-four** 37:21
**thought** 58:13
  65:21
**thoughts** 78:4
**thousand** 38:15,17
  73:13,18 77:23
  77:24
**three** 6:11 9:12
  10:17 12:18,24
  27:22 55:18
  66:25 83:16
**three-page** 60:18
**throws** 45:22
**Thursday** 1:10
**till** 7:21 8:13
**time** 5:18 6:1 8:8
  11:1 12:24 13:4
  13:20 19:25
  20:10,10 24:12
  26:15 27:23 29:2
  29:4,6 30:1 42:8
  57:4 58:19 61:9
  69:20 71:13 81:5
  88:5
**times** 12:18,25
  37:7,23 38:17
  73:25 81:14
**title** 18:10,14
**today** 5:18 6:15
  24:11 45:15 46:4
  55:1 58:24 65:20
  66:4,8 68:22
  77:16 80:12
  84:12 87:15
**today's** 82:9

**told** 14:1 20:11
21:22,23 28:10
39:17 53:6 69:25
**tomorrow** 43:24
**top** 13:16 79:10
**total** 37:24 39:11
**traditional** 27:1
**Trail** 34:24 54:3,7
**training** 8:3,3,20
**transcript** 3:8
89:8,12
**trends** 58:8
**trial** 13:3,9
**trouble** 28:5
**troubled** 9:2,2
**true** 89:12
**trustee** 10:3 44:7
**trying** 17:23 24:23
26:12,17 27:12
36:20 39:3 51:24
72:17 78:19
**turn** 31:9
**turnaround** 19:9,11
**turned** 18:2
**twenty-three** 32:16
**twice** 21:20
**two** 10:24 12:8,19
13:1,2,8 17:22
19:1 49:11 54:2
54:9 62:23 76:23
**two-thirds** 57:7
**type** 8:22 14:23
15:1,14 38:2
44:8 59:21 85:5
85:10,13,23 86:3
**typewriting** 89:10
92:15
**typical** 15:4,9
**typically** 24:25
28:22 44:20
61:16

**U**

**unable** 35:16 36:15
**undergraduate** 8:2
**understand** 5:19,22
5:24 28:23 33:22
34:15 35:11 36:6
36:11,21 38:13
38:16 39:3 52:23
62:23 72:17,18
80:5 83:8
**understanding**
24:10 27:3 28:16
33:3,12,14 34:20
68:7 83:4
**Understood** 17:7
**underwrite** 25:20
**underwriting** 8:5

16:4,6,7 25:16
**underwritten** 26:9
**Unfortunately** 28:7
56:7
**Union** 7:10,15 11:2
**uniqueness** 69:2
**United** 1:1 7:20
**university** 8:1,6,7
8:10
**unnecessary** 38:3
**unsecured** 28:2,11
28:13
**unusual** 55:22
**ups** 62:3
**use** 29:18 37:13
45:11,12 50:22
59:2,3,16 60:25
71:22 72:16,21
75:20 83:13
84:11,13 86:12
86:23 91:9
**USPAP** 86:18
**usual** 15:5,9

**V**

**v** 13:18
**valid** 59:19,20
**Vallambrosa** 9:20
10:6 13:5 16:10
16:11 17:2
**valuation** 22:24
36:18 37:14,17
38:9 51:17 74:9
75:13 76:19,20
76:21 77:25
81:22,24 84:5
86:10
**valuations** 72:4
**value** 22:23 23:9
26:18,21,22
28:24,25 29:5,6
35:6,25 36:1,24
38:11 40:10,21
40:25 41:23
42:16,21 43:6
44:10,15,16,17
44:18,25 45:7,8
45:9,11,13,17,18
46:12 47:22
48:21 51:24
58:21,22 64:19
68:16,18,19 69:2
69:20,21 70:11
70:11,12 71:9
72:1,11 74:5,6
76:1,1,4,7,11,14
76:17 80:15 82:7
82:9,11,11,13
83:5,6,9,11,14

84:11,14,22
**values** 36:7 60:13
**variables** 86:21
**variations** 39:21
**various** 8:3,4,5
**vast** 25:2
**verify** 19:3 82:24
**version** 11:16 12:1
46:22
**versus** 51:22 52:1
58:21 74:5 75:5
75:6
**viability** 51:21
70:13 71:12
**viable** 25:10
**video** 1:7 73:22
**view** 35:4,5 39:14
39:16 63:7 68:5
81:22 82:1
**Village** 1:5 5:16
20:1 32:6 34:24
53:15,19,23
56:20 57:2 58:10
59:23 60:17
62:13 79:9
**Villages** 4:7
**visibility** 55:17
**visit** 52:12,14,18
52:21 53:5,14,17
53:20
**visited** 53:24
54:16
**vitae** 11:25 12:9
**vote** 84:25

**W**

**Wachovia** 7:10,11
7:14 67:1,2
**waiting** 49:17
**waive** 28:1,11 88:3
88:6
**walk** 13:25 35:7
37:10 61:5
**walked** 51:16,17
**walking** 62:19
**want** 6:1,2,6 12:10
20:17,22 22:13
27:20 29:18
30:21 33:9,11
34:14,16 41:16
41:23 46:7 47:19
61:11,21 75:3
80:5 81:19,21
82:23,25 84:11
84:16 85:19
**wanted** 12:12 48:10
74:17 78:15
**wasn't** 17:3 21:23
23:11 36:19

63:19 72:7
**way** 24:25 25:6
42:5 44:5 56:7
57:7 68:2 69:15
80:23 81:3 85:8
**ways** 27:11 71:14
**week** 66:18
**weekly** 65:5
**went** 35:23 43:3
44:6 46:13
**whatsoever** 37:3
43:13
**willing** 44:7
**witness** 9:24,25
10:14,15,22 11:3
11:4,5,13 12:19
12:24 13:7,17,22
20:8 30:16,17,20
32:25 33:25
36:11,13,22 40:3
40:6 41:5,12,19
55:4 70:22,24
71:2 75:19 78:21
78:23 82:23 88:2
88:4,12
**witness's** 41:3
**word** 32:3
**words** 41:4
**work** 8:22,25 16:2
18:7,25 19:6,7
28:16,17
**worked** 18:5,7,21
29:11
**working** 25:3 33:11
33:14 34:14
49:21 54:3,7,13
65:4
**workouts** 54:8
**works** 28:23
**worry** 48:19
**worrying** 58:19
**worse** 55:8
**worst** 69:9
**worth** 42:1,3 45:15
45:20 69:4,11,13
84:16
**wouldn't** 56:10
59:1 80:8
**written** 68:8,17
**wrote** 19:20

**Y**

**Yeah** 22:14 33:2
34:13 49:15
50:19 53:10
55:20 56:25
60:25 63:3 78:14
87:25
**year** 10:1 21:20

51:2,4 65:19
73:15,20 74:2,16
**years** 8:12 9:12
10:17,24,25 25:3
29:7,7,8,8,12
37:3 38:21 49:6
86:3
**Yep** 5:25 31:13
57:18 66:22,24
67:10
**yield** 44:14,16
45:2,4

---
**Z**

**zero** 37:9 38:5
44:24 69:11
74:20 75:6

---
**$**

**$10** 22:19,24 42:4
45:12,13,20,23
46:15,25 48:23
49:3,6 51:11
68:18 76:17 84:5
84:13,16
**$10.2** 36:24 37:13
37:16 38:9,12
43:1,2
**$115,000** 74:17
**$141,000** 30:2,4
35:9,10,16 36:15
**$149,176** 80:14
**$17,472,448** 37:25
**$21,960,000** 37:7
**$23-1/2** 31:5
**$29** 39:15 42:7
81:24
**$48,534** 37:19
**$5** 59:19
**$5,000** 44:3 73:19
74:2
**$59,872** 49:13
**$59,872.76** 49:16
50:8
**$61,000** 37:2
**$7500** 74:1
**$9** 59:19
**$98,000** 50:22

---
**1**

**1** 2:4 5:5 50:20
57:13 72:22 73:1
78:7,18 89:11
90:7 91:4
**1st** 23:7
**1.06** 33:7,9
**1.9-percent** 44:1
**1:30** 67:19
**1:40** 67:19

**10** 2:14 29:23 45:1
47:20 49:9 83:14
84:15
**10-percent** 73:19
85:3
**10.B** 5:2 90:4
**10.2** 36:25 71:10
71:22 76:17
83:14
**100** 46:5 74:6,18
75:7,24
**100-percent** 43:14
44:8 45:21 46:18
47:22 72:12
82:10 87:11
**101** 4:10
**11** 1:6,10 2:15 5:5
5:16 16:18,19
52:1 90:18 91:3
**11:37** 1:11
**11:59** 19:23
**1100** 1:13
**1111(b)** 27:11,23
27:24 28:10,21
29:13,25 35:8,18
36:16 39:6,19
40:4,13 42:12,14
51:16
**1111(b)-type** 35:15
**1124** 27:14
**115,000** 73:15
**12** 2:17,18 9:15,18
11:7,19,21,24
12:6,12 41:11
79:11
**12A** 2:18 12:5,11
12:13,15,18
13:21,23 15:7
**12th** 23:6
**12-1/2** 74:4
**12-1/4** 75:14 84:25
85:1,2,4
**12:04** 19:23
**12:23** 30:23
**12:28** 30:23
**12:57** 49:24
**12:59** 49:24
**13** 2:19 50:1,5
79:11 80:1
**13th** 38:12
**14** 2:20 31:5 57:20
57:21,24 58:24
**14th** 22:21
**141,000** 29:20
71:15
**15** 2:21 45:4 60:20
60:21 63:4 73:24
73:25 74:3,23
80:3 81:16,20

**15A** 2:22 79:18,22
80:1 81:16,20
**15th** 89:18
**15-percent** 73:14
74:5,20
**16** 3:3 65:8,9,12
**17** 3:5 38:5 67:5
67:11,24
**17th** 1:13
**17,472,000** 38:22
**171** 1:13
**18** 3:6 67:15,20
68:4
**1980** 77:9
**1989** 7:21
**1991** 7:17
**1999** 7:21

---
**2**

**2** 2:5 29:23 41:12
72:23,25 79:10
79:10 90:9 91:5
**2-percent** 75:22
**2.04** 31:10 33:13
35:2
**2.04(a)** 32:3
**2.2** 83:15
**2:02** 79:24
**2:06** 79:24
**2:18** 87:23
**2:22** 87:23
**2:24** 88:9
**20** 24:2 29:7 45:1
47:21 92:19
**20th** 24:1
**200** 4:5
**2004** 7:7,7
**2006** 23:22 31:5
**2008** 9:20 10:2
**2009** 3:6 10:3
23:10 67:14
**2010** 1:10 2:8,9,10
2:11,12,13,14,16
2:20 3:5 12:10
22:21,22 23:25
24:1 52:16 58:3
65:21,23 67:4
80:1 89:18 90:18
91:3
**2011** 50:20 79:11
**2012** 50:20 59:18
**2016** 29:21
**21** 3:6 67:14
**23** 27:4
**23-1/2** 27:4 81:24
**2638l** 34:24
**27** 3:5 67:4
**28th** 22:22 23:6
**2800** 4:9

**29** 27:6 39:8,17

---
**3**

**3** 2:6 31:25 56:23
90:10
**3-1/4** 87:16
**30** 24:16 29:7
38:20 46:23 49:6
52:20 57:14 86:3
**30th** 23:7
**30(e)** 88:10 91:6
**30-minute** 53:5
**30-year** 29:22 37:1
37:18 38:14 49:1
**31** 50:20
**32801-3385** 4:6
**33,000** 46:20
**33602** 4:10
**34** 37:3
**360** 37:7,23 38:17

---
**4**

**4** 2:8 43:14 46:6
90:11
**4,000** 44:3
**4-percent** 37:17,18
38:13
**40** 46:23
**400** 21:21
**450** 4:5
**48,000** 37:20
**48-1/2** 38:15,17

---
**5**

**5** 2:4,5,7,8,9,9,10
2:11,12,13,14,16
41:23 47:20 87:5
90:13
**5th** 52:15
**5/13/2010** 79:9
**50** 2:19 29:7 73:18
74:4
**50,000** 73:18,23,25
79:15
**50-percent** 44:25
**57** 2:20
**59,872** 50:24
**59,872.76** 50:18

---
**6**

**6** 2:10 41:24 46:6
**6th** 24:18,18 40:8
66:18
**6-percent** 37:1
**6.034** 43:14 48:24
49:6 82:24 83:21
84:2 86:6,9
**6.034-percent**
82:15 83:7

**60** 2:21
**61,000** 37:7 49:8
**649** 51:1
**649,000** 50:21
**65** 3:4
**67** 3:5,6

---
**7**
---

**7** 2:11 23:22 42:17
  43:2 44:6,7,11
  44:14 69:23
**70** 29:8
**700** 54:10
**718,000** 50:25
**75** 54:21,21
**78** 8:13
**79** 2:22

---
**8**
---

**8** 2:12 23:22 41:24
  41:24
**82** 8:13
**88** 89:11

---
**9**
---

**9** 2:13,17 23:22
**9-11-28(c)** 90:8
**9-11-30(e)** 88:12
  91:7
**9:10-bk-03090-ALP**
  1:5
**90,000** 73:16
**91** 7:18,21